**SAFECARD SERVICES, INC., Plaintiff,**

v.

**DOW JONES & COMPANY, INC., et al., Defendants.**

**Civ. A. No. 81–0631–A.**

United States District Court,
E. D. Virginia,
Alexandria Division.

April 29, 1982.

---

**2.** *See Oklahoma v. Federal Energy Regulatory Commission*, 661 F.2d 832 (10th Cir. 1981).

Oren R. Lewis, Jr., Arlington, Va., Hugo L. Black, Jr., Miami, Fla., for plaintiff Safecard.

David Fiske, John E. Coffey, Alexandria, Va., for defendants Ferris, Hurney, Kushnick, Ferry and Credit Card Service Corp.

Thomas Moncure, Alexandria, Va., for defendants Dow Jones & Co., Inc., Abelson and Anreder.

Philip Hare, Falls Church, Va., for defendant Purcell Graham & Co.

Andrew P. Miller, Washington, D. C., for defendant Cox.

## MEMORANDUM

RICHARD L. WILLIAMS, District Judge.

This matter came before the court on defendants' motions for summary judgment under Fed.R.Civ.P. 56(b). For the reasons stated below, the court grants partial summary judgment to defendants.

Plaintiff SafeCard is a public company engaged in the mass mail order marketing of a loss notification service for credit cards. A cardholder has a maximum liability of $50 per card when an unauthorized use of a card as a result of loss or theft occurs. If the cardholder notifies the issuer of the card's theft or loss before an unauthorized use of the card occurs, the cardholder has no liability. *See* 15 U.S.C. § 1643. Of course, the cardholder may notify each card issuer directly when he loses credit cards. The chief benefit of the service is its convenience: a subscriber whose cards are missing need call only the notification service instead of calling each card issuer.

SafeCard markets its service through credit card issuers. Because the service is marketed through but is not supplied by the issuers, SafeCard refers to its marketing as "third-party-endorsed."

SafeCard claims that the defendants conspired to disseminate false or misleading statements in connection with SafeCard's sales of its securities, in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5 thereunder (Count I);[1] and that the defendants con-

---

1. In pertinent part, Section 10(b) provides:

    It shall be unlawful for any person, directly or indirectly, by the use of any means or

spired to eliminate SafeCard from competition in the credit card loss notification market, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 (Count II).[2,3] Pendent state claims accompany the federal claims (Counts III, IV and V.)

Defendant Credit Card Services Corporation ("CCSC") also runs a credit card loss notification service that is marketed by third-party endorsements. CCSC is located in Alexandria, Virginia. Defendant Ferry is the Chairman of the Board of CCSC. CCSC employs defendant Hurney as Vice-President of Sales. (These three defendants are referred to collectively as "the CCSC defendants").

Dow Jones is a publicly held corporation which publishes *Barron's National Business and Financial Weekly* ("*Barron's*") and *The Wall Street Journal*. Defendant Abelson works for *Barron's*; he writes a column in it entitled "Up and Down Wall Street." Defendant Anreder also works for *Barron's*; he assisted Abelson in preparation of his column. (These three defendants are referred to collectively as "the Dow Jones defendants".)

According to SafeCard, CCSC, Ferry, Hurney and others conspired to monopolize the "third-party-endorsed credit card loss notification market" as early as 1977. The conspirators had an agent steal a copy of a confidential proposal SafeCard had submitted to Standard Oil of California. They also decided to manipulate the market for SafeCard stock and to "stir up governmental investigatory agencies against Safe-Card."[4] (Second Amended Complaint, ¶ 27.)

---

instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
Rule 10b–5, promulgated thereunder, provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
2. Section 1 provides, in pertinent part:
Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.
Section 2 provides:
Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of court. 15 U.S.C. § 2.
3. The court has jurisdiction under 15 U.S.C. § 78aa, 15 U.S.C. § 15, and 28 U.S.C. § 1331.
4. In March of 1977 the Federal Trade Commission notified SafeCard that the FTC was conducting an examination of SafeCard's practices in relation to 15 U.S.C. § 45. The letter notifying SafeCard of the examination requested that it forward to the FTC descriptions of SafeCard's enrollment and billing procedures.
In late November 1978, SafeCard's counsel received another letter from the FTC. This letter stated:
We are concerned that HotLine's [Safe-Card's] advertising may inadequately explain the negative option aspect of HotLine's billing procedures, and fail to apprise customers that they will be required to act affirmatively to cancel HotLine services in order to prevent an automatic billing extending coverage beyond the 6 month free trial period. We believe that the inadequacies of HotLine's advertising may constitute a failure to disclose material facts necessary to portray fairly the negative option aspect of HotLine's billing arrangements and may, therefore, violate Section 5 of the Federal Trade Commission Act, 15 U.S.C. Section 45.
The letter requested that SafeCard forward its advertising and solicitation materials to the FTC.

The conspirators then "enlisted the aid" of the Dow Jones defendants. The Dow Jones publications were to provide " 'independent' press verification of the malicious and disparaging charges which CCSC and its conspiratorial agents were making as part of their campaign to eliminate Safe-Card as CCSC's only competitor in the relevant market." (Second Amended Complaint, ¶ 39)

## THE DOW JONES DEFENDANTS

I. COUNT I: THE RULE 10b–5 CLAIM. Four articles critical of SafeCard appeared in *Barron's* between June 19, 1978, and July 6, 1981. The authors were Abelson, Anreder and Dr. Abraham Briloff, the Emmanuel Saxe Distinguished Professor of Accountancy at Baruch College of the City University of New York. The articles disparaged SafeCard in various ways: they questioned the value of Safe-Card's stock, impugned its accounting techniques, reported governmental investigations of SafeCard, and commented on its marketing techniques. SafeCard claims that the articles contain untrue statements

of material fact,[5] or omit to state material facts, in order to create a false impression, and that these statements or omissions were made in connection with the grant and exercise of certain SafeCard options.

### A. *"In connection with . . . sale."*

■ It is clear that plaintiff considered itself the victim of widely circulated misinformation about it long before it chose to grant options. A letter from the chairman of SafeCard to Warren H. Phillips of Dow Jones, dated October 30, 1978, states: "[I]t appears *Barron's* knowingly and maliciously published false information designed to wreak havoc on the business of SafeCard as well as the public market for its securities." In another letter, reprinted in the March 26, 1979 issue of *Barron's*, SafeCard's counsel states: "If what you do this time is as irresponsible, malicious and untrue as it was last time, we shall hold you, Mr. Abelson, *Barron's* and Dow Jones responsible for all the consequences of the previous article and whatever you come up with this time."

The earliest time that a "sale"[6] could have occurred is on October 22, 1979, when

---

The investigation by the FTC was closed in June 1979.

On September 18, 1978, the Securities and Exchange Commission sent SafeCard a letter with a subpoena duces tecum attached, requiring the production of certain documents. The letter notified SafeCard that the SEC had entered a "Formal Order of Investigation" of the company. An internal document of the SEC, recommending that the investigation be closed, dated June 27, 1980, states that

[t]his matter came to the attention of the Miami Branch Office as a result of information reported by a former vice-president of SafeCard . . ., whereby he alleged that Safe-Card was incapable of providing the services to its customers for which it was billing them; SafeCard prematurely recognized $1.9 million in revenue during the second quarter of 1978; and that SafeCard was not recording all its liabilities on its books.

Originally SafeCard believed that both the SEC and *Barron's* were dupes of the former SafeCard vice-president, Warren E. Drew, and did not consider the Dow Jones defendants participants in a conspiracy. On June 20, 1980, SafeCard's counsel wrote the SEC:

The sole source of this charge is the aforementioned Warren E. Drew. We have many times expressed our dismay that one such as Warren E. Drew could have established such

credibility with cynical public and private institutions such as the SEC and *Barron's.* Perhaps, however, neither institution has been exposed before to a hot stock artist putatively transformed *instanter* by an angel vision straight out of his television set from a wolf fat from the blood of widows and orphans to a lamb ready to sacrifice all for widows and orphans. Whatever, we all know that the Devil never turns loose one of his disciples gracefully and, alas, that pitchforked tail ogre was not to be denied his influence over Warren E. Drew . . . .

5. Curiously, although SafeCard alleges falsehood and malice on the part of the Dow Jones defendants, it has not brought a pendent state libel claim.

6. The definition of "sale" given in Section 3(a)(14) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(14), is very broad: "any contract to sell or otherwise dispose of." The exercise of a stock option is a sale for purposes of the Act. *Maldonado v. Flynn*, 448 F.Supp. 1032 (S.D.N.Y.1978). However, the court does not agree with SafeCard's Form 10–K for the fiscal year ended October 31, 1981, filed January 29, 1982, which reads: "No options were exercised during the fiscal year ended October

SafeCard's management decided to establish a stock option plan. The SafeCard board ratified this plan on December 11, 1979. The first agreements to exercise the options were signed by SafeCard officers beginning in March of 1980.

In the ordinary situation a false or misleading statement of material fact *causes* a sale when the seller *relies* on it. For instance, a false or misleading statement made in a newspaper column, relied on by stockholder readers, may cause them to sell to their detriment. By contrast, if the seller knows the statement to be false, he has not relied on its purported veracity, and the statement has not induced his sale. SafeCard clearly did not rely on the Dow Jones defendants' statements about it. Also, SafeCard does not claim that the statements caused it to sell.

Whether proof of some causal nexus between fraud and sale ("transaction causation") is an essential element of proof is a matter of dispute. Some courts have not required proof of transaction causation. After all, the policy of Rule 10b–5 is to deter frauds and to provide redress for the losses caused by frauds. ("Loss causation" definitely is a necessary element of proof.) Other courts have required proof of transaction causation. *Compare Ketchum v. Green*, 557 F.2d 1022, 1029 (3d Cir. 1977), *cert. denied*, 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977), with *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 380–81 (2d Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).

In *Gurley v. Documation, Inc.*, 674 F.2d 253 (4th Cir. 1982), the Fourth Circuit denied standing to a plaintiff who claimed he was fraudulently caused to delay the sale of his securities, because of the potential for abuse of § 10(b) by plaintiffs with unmeritorious claims. Because a delay-in-sale claim usually would turn on conflicting oral testimony as to whether fraud was the cause of the delay in sale, a plaintiff with an unmeritorious delay-in-sale claim would be able to resist disposition of his suit by pretrial motion, and could exert pressure on a defendant to settle even a frivolous case. *See Gurley* at 256–258.

*Gurley* bears on the instant case in two ways. First, it implies that transaction causation is a relevant consideration in a misrepresentation case. *Compare Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) (obligation to disclose plus withholding of material fact establishes requisite causation and reliance in case involving primarily failure to disclose). Second, it rejects a certain type of transaction causation as insufficient to confer standing under § 10(b), because the speculative nature of proof of that kind of causation would open up a Pandora's box of unmeritorious claims.

A finding of "in connection with" where a person sells after knowledge of a fraud would put him in an anomalous risk-free situation: if his securities performed less well than he hoped, he could sue under § 10(b) to raise his yield; or if his securities performed up to expectations despite the fraud, he could refrain from suit. By con-

---

31, 1981. However, during fiscal 1980, officers and directors holding stock options to purchase 131,200 shares, personally and unconditionally obligated themselves to pay the exercise price of the options within the five-year term of the options, thereby exercising said options." The court believes that a correct statement as to exercise was included in SafeCard's Form 10–K submitted for the previous fiscal year: "At October 31, 1980, none of the above listed options had been exercised, with options for 7,000 shares still available for grant under the 1979 non-qualified stock option plan." Nonetheless, because the grant of options is a sale within the meaning of Section 3(a)(14), *Collins v. Rukin*, 342 F.Supp. 1282 (D.Mass.1972); *Wright v.*

*Heizer Corp.*, 560 F.2d 236 (7th Cir. 1977), *cert. denied*, 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978), the court assumes for purposes of this motion that the grant of options by SafeCard constituted sales within the meaning of Section 3(a)(14).

SafeCard also claims a "sale" within the meaning of Section 3(a)(14) when it signed an underwriting contract for issuance of 1,000,000 shares of stock with Drexel, Burnham, Lambert, Inc. on May 20, 1981. Whether or not this counts as a sale for purposes of § 10(b), SafeCard was aware at that time also of the publication of what it regarded as false or misleading statements about it.

trast, a seller in a non-fraud situation always takes a risk that the performance of his securities will fall below expectations.

It is not the purpose of Rule 10b–5 to establish an insurance scheme for corporate issuers and investors. *See List v. Fashion Park, Inc.*, 340 F.2d 457, 463 (2d Cir. 1965), *cert. denied*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). "The securities laws were not enacted to protect sophisticated businessmen from their own errors of judgment." *Hirsch v. DuPont*, 553 F.2d 750, 763 (2d Cir. 1977). The court holds that a corporate securities issuer who voluntarily[7] sells after knowledge of a fraud does not rely on and is not caused to sell by the fraud, and cannot recover under Rule 10b–5. *In re Penn Central Securities Litigation*, 62 F.R.D. 181, 186 (E.D.Pa.1974).

**B.** *"Untrue statement of material fact."*

■ A true statement does not fall within the ambit of Rule 10b–5. A number of statements to which SafeCard objects are indisputably true.[8]

A number of statements appearing in the articles, particularly those authored by Dr. Briloff, are expressions of opinion. Although Rule 10b–5 speaks in terms of statements and omissions of facts, some opinions have been considered statements of "fact" for purposes of Rule 10b–5. *See, e.g., Dolgow v. Anderson*, 53 F.R.D. 664 (E.D.N.Y. 1971), *affirmed per curiam*, 464 F.2d 437 (2d Cir. 1972). In such cases the defendant usually is a broker-dealer, who by virtue of his position and relationship to clients has a duty to disclose what he knows and to undertake a reasonable investigation. *See, e.g., Hanly v. Securities and Exchange Commission*, 415 F.2d 589 (2d Cir. 1969). This duty is not obviously transferable to writers for a newspaper.

■ The court holds that Rule 10b–5 cannot reach the Dow Jones defendants' statements expressing opinion, because the statements appeared in the press, the context or specific assertions make clear that the statements are expressions of opinion,[9]

---

7. Involuntary sales are a different matter. *See Vine v. Beneficial Fin. Co.*, 374 F.2d 627 (2d Cir. 1967), *cert. denied*, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967) (forced sales of stockholders by short-form merger squeeze-out makes reliance irrelevant).

8. In the June 19, 1978 issue of *Barron's*, Abelson stated:

> One thing that's bothered us from the start was the "negative option" aspect to the company's Hot Line service—that is, if the credit cardholder, during his free trial period, doesn't actively do something to cancel, he's automatically enrolled and just as automatically billed. That sort of thing is strictly no-go .now if a product is involved. We're not at all clear why a service is different. But legally, it is different. We might add that it seems common practice in the field; at least, so far as we know, at least one major SafeCard competitor uses the identical approach.

Dow Jones acknowledges that the statement that negative option is "no-go" for products is incorrect. However, that is not an untrue statement of *material* fact, since SafeCard offers a service.

A fact is not material if there is not a substantial likelihood that a reasonable investor would consider the fact important in making her investment decision. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 426 n.9, 96 S.Ct. 2126, 2131 n.9, 48 L.Ed.2d 757 (1976).

9. SafeCard singles out Dr. Briloff's statement in the July 6, 1981, issue of *Barron's*, "I maintain that the company, in fact, is engaged in accounting no-no's," as an example of a statement put forward as an assertion of fact. Whether "in fact" implies "it is a matter of fact that . . .", or was used merely for emphasis, is a question over which reasonable minds might differ. More telling that the statement is an expression of opinion is the sentence's beginning with "I maintain that . . . ." Most important, the context in which the statement appears indicates that the author is expressing his own opinion, with which (the author duly notes) others disagree. In pertinent part, the article reads:

> As a general rule, cost deferrals are comprehensible to the extent that they seek to match costs with revenues. But—and in SafeCard's case, this is a very big but—as the company's footnote suggests, SafeCard is matching most costs not only against revenues but also against extended expectations. And this is where the concern and its auditors, *as I see it*, part company with proper accounting.
>
> As the financial statements indicate, SafeCard charges off its marketing costs over a 3-to-10-year period (as noted, the company recently shifted to a principally 10-year write-off, but more about that later). In fiscal 1980, the expense for its service programs

the opinions are not clearly unreasonable (in which case they would be immaterial anyway), there is no evidence that the opiner does not believe the opinion he expressed, there is no evidence that the opiner or the publisher have had any economic interest in the corporation written about or in competitor corporations, and the opiners are not insiders to the corporation written about.

II. COUNT II: THE ANTITRUST COUNT. The Dow Jones defendants are capable of committing antitrust violations against SafeCard only via conspiracy. Since Dow Jones does not compete with SafeCard, the Sherman Act's § 2 prohibition on attempts to monopolize cannot apply to Dow Jones.

A. *Sherman Act § 2: Specific Intent.* To establish the existence of a combination or conspiracy to monopolize in violation of Section 2, a plaintiff must prove the following elements: (1) the existence of a combination or conspiracy; (2) overt acts done in furtherance of the combination or conspiracy; (3) an effect upon a substantial amount of interstate commerce; and (4) the existence of specific intent to monopolize.

*Cullum Electric & Mechanical, Inc. v. Mechanical Contractors Association of South Carolina,* 436 F.Supp. 418, 425 (D.S.C.1976), *affirmed,* 569 F.2d 821 (4th Cir.), *cert. denied,* 439 U.S. 910, 99 S.Ct. 277, 58 L.Ed.2d 255 (1978).

SafeCard's proposed evidence to prove specific intent on the part of the Dow Jones defendants includes: (1) Abelson evinced personal animosity towards SafeCard chairman Peter Halmos; (2) the Dow Jones defendants contacted SafeCard's competitor CCSC and federal agencies concerning SafeCard on various occasions; (3) an advance copy or draft of a *Barron's* article may have reached one of the other defendants; (4) statements critical of SafeCard made by different defendants were similar in content; (5) statements published by the Dow Jones defendants were false or misleading; and (6) CCSC used the publications against SafeCard in competing for accounts.

CCSC's using the publications to scare accounts away from SafeCard merely illustrates the propensity of competitors to repeat unflattering statements about the opposition. Abelson's animosity is consistent both with monopolistic and nonmonopolistic intent. The Dow Jones defendants' contacts with CCSC and federal agencies are consistent with ordinary news gathering. Dow Jones published no falsehoods about SafeCard. The publication of truth and

amounted to $7.8 million ($1.5 million, $1.7 million, $1.9 million and $2.7 million for the four consecutive fiscal quarters). In the first two quarters of the current fiscal year, the amounts charged were $2.9 million and $3.4 million, respectively.

*This amortization process presumably is entirely in accord with generally accepted accounting principles, since the fiscal year reports received the nihil obstat (a clean opinion) from Alexander Grant & Co., Safe-Card's independent auditor.* The interim quarterly data for the current year, albeit unaudited, are included in a June 1981 preliminary prospectus (issued in connection with a proposed one-million share common stock offering, the proceeds to go roughly half to the company and half to certain selling stockholders). Further, *SafeCard's management has advised me that its accounting practices have been reviewed by the Securities & Exchange Commission's Miami office and found appropriate.*

*All this authentication notwithstanding, I respectfully disagree. I* maintain that the company, in fact, is engaged in accounting no-nos. When queried by me, the company's management and its auditors responded by asserting that they were following the "matching process," i.e., the matching of costs against related revenues. As I suggested, this is fine, up to a point. But SafeCard, *I submit,* is carrying this concept to an extreme.

Thus, it is matching increased costs not only against revenues presumed to have been derived from those outlays, but also, as noted, those expected to be derived in the future. Trouble is, the latter is expected to be derived over as much as a decade through renewals, which may or may not materialize and which make little, if any, allowance for heightened competition or changing technology. And here is where *I contend* that Safe-Card's management and auditors have departed from a fair application of generally accepted accounting principles, with a consequent distortion of the company's financial statements. [Emphasis added]

reasoned opinion (which may or may not agree with the opinions of news sources) is consistent with ordinary news reporting and commentary. Were newspapers to become hostage to antitrust suits surviving pretrial disposition on the basis of news source contacts and critical commentary, the threat of such suits would operate as a deterrent to the effective functioning of the press.

Even though proof that defendants have engaged in practices that make no economic sense unless monopoly results is not an essential element of a Sherman Act § 2 claim, such proof is often offered as probative of the existence of conspiracy under both §§ 1 and 2. See Admiral Theatre Corp. v. Douglas Theatre Co., 585 F.2d 877, 884 (8th Cir. 1978); H & B Equipment Co., Inc. v. International Harvester Co., 577 F.2d 239, 245 (5th Cir. 1978); Overseas Motors, Inc. v. Import Motors, Ltd., 375 F.Supp. 499, 535 (S.D.Mich.1974), affirmed, 519 F.2d 119 (6th Cir. 1975), cert. denied, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975).

■ Specific intent to monopolize also may be inferred from extreme predatory or exclusionary conduct. Human Resource Institute v. Blue Cross, 498 F.Supp. 63 (E.D. Va.1980); United States v. Jerrold Electronics Corp., 187 F.Supp. 545 (E.D.Pa. 1960), affirmed, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961); Greenville Publishing Co. v. Daily Reflector, Inc., 496 F.2d 391 (4th Cir. 1974).

■ Of course, it would be impossible for a noncompetitor such as Dow Jones to engage in "predatory conduct" towards Safe-Card, but it is entirely possible for a newspaper writer to derive economic benefit from his writing by, for instance, touting a corporation in which he owns stock. See Zweig v. The Hearst Corporation, 594 F.2d 1261 (9th Cir. 1979). The lack of any evidence of economic benefit inuring to the Dow Jones defendants as a result of their alleged acts militates strongly against the reasonableness of inferring the requisite specific intent in this case. See First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 287, 88 S.Ct. 1575, 1591, 20 L.Ed.2d 569 (1968) (lack of benefit to defendant militates against finding of conspiracy).

The standards governing summary judgment in antitrust actions are well-known. Plaintiffs can be relied upon to quote Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); "[S]ummary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." Defendants exhibit a marked preference for White Motor Co. v. United States, 372 U.S. 253, 259, 83 S.Ct. 696, 700, 9 L.Ed.2d 738 (1963): "Summary judgments have their place in the antitrust field, as elsewhere . . . ."

The fewer the individual strands of circumstantial evidence, and the less distinguishable assertedly probative conduct is from the conduct of persons going about their business in an ordinary way, the less reasonable an inference of specific intent to monopolize becomes. There is a vanishing point beyond which inferences of intent on the basis of "disparate strands of highly equivocal circumstantial evidence" become unreasonable. J. W. Burress, Inc. v. JLG Industries, Inc., 676 F.2d 693 (4th Cir. 1982) (unpublished) (inferences of conspiracy and price discrimination). The evidence which plaintiff intends to present at trial is too attenuated for a rational jury to infer the specific intent required under § 2 of the Sherman Act.

B. Sherman Act §§ 1 and 2: Conspiracy.

For the same reasons that plaintiff's evidence is deficient on proof of the necessary element of specific intent under § 2, the court finds that the evidence is likewise deficient for proof of conspiracy under §§ 1 and 2.

C. Sherman Act § 1: "Restraint of Trade."

■ Section 1 of the Sherman Act forbids "conspira[cies] in restraint of trade."

Soon after enactment of the Sherman Act, the Supreme Court interpreted Section 1 to ban only "undue limitation on competitive conditions," that is, restraints which are "unreasonably restrictive." *Standard Oil of N.J. v. United States*, 221 U.S. 1, 58–60, 31 S.Ct. 502, 515–516, 55 L.Ed. 619 (1911). Some restraints are so obviously incompatible with competitive behavior that they constitute per se violations of Section 1. *See, e.g., United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221–3, 60 S.Ct. 811, 843–844, 84 L.Ed. 1129 (1940) (horizontal price-fixing); *United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) (territorial market allocation). Other putative restraints are subject to a "rule of reason" analysis:

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).

The activity engaged in by the Dow Jones defendants was the publication of truth and opinion of the sort described above. Even assuming a combination of the press and a competitor of plaintiff such as plaintiff alleges, this cannot be the kind of activity which Section 1 of the Sherman Act was designed to prevent. This sort of behavior is far removed from a paradigmat-ic trade restraint such as price-fixing undertaken by a group of competitors against a fellow competitor. Moreover, it is an article of national faith that on balance the free flow of truth and reasoned opinion *enhances* competition. Hence the Dow Jones defendants have not engaged in any unreasonable restraint of trade.

■ III. THE PENDENT STATE CLAIMS. The court declines to exercise jurisdiction over the pendent state claims as to the Dow Jones defendants for two reasons. First, the application of Va.Code § 18.2–500 [10] to press defendants could raise substantial constitutional questions from which the court believes it should abstain.[11] *Cf. New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–726, 11 L.Ed.2d 686 (1964) (public-official plaintiff must prove actual malice in defamation action). The lack of guidance from the state courts on interpretation of the statutory terms—for instance, whether the term "maliciously" refers to "legal malice" or "actual malice"—exacerbates the difficulties of application. Second, now that the federal counts are no longer in the case against Dow Jones, the court has doubts regarding the propriety of applying Virginia law as between parties whose principal places of business are Florida (SafeCard) and New York (Dow Jones). Hence the court will dismiss the state counts without prejudice by the accompanying order.

---

**10.** In pertinent part, § 18.2–500(a) reads:
Any person who shall be injured in his reputation, trade, business or profession by reason of a violation of § 18.2–499, may sue therefor and recover three-fold the damages by him sustained, and the costs of suit, including a reasonable fee to plaintiff's counsel; and without limiting the generality of the term, "damages" shall include loss of profits.
In pertinent part, § 18.2–499 provides:
(a) Any two or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of wilfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever, or for the purpose of wilfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act, shall be jointly and severally guilty of a Class 3 misdemeanor. Such punishment shall be in addition to any civil relief recoverable under § 18.2–500. (b) Any person who attempts to procure the participation, cooperation, agreement or other assistance of any one or more persons to enter into any combination, association, agreement, mutual understanding or concert prohibited in subsection (a) of this section shall be guilty of a violation of this section and subject to the same penalties set out in subsection (a) hereof.

**11.** Because the court grants summary judgment to the Dow Jones defendants on the federal counts on nonconstitutional grounds and declines jurisdiction over the state counts, it takes no position on the merits of the constitutional arguments they have raised.

### THE CCSC DEFENDANTS

For the reasons stated above, and because the CCSC defendants did not make the statements upon which SafeCard's § 10(b) claim is premised, the court grants summary judgment to the CCSC defendants on Count I.

The Sherman Act § 1 and § 2 claims and the pendent claims survive the motion for summary judgment as to the CCSC defendants, because issues of material fact remain. The § 1 count remains in the case insofar as plaintiff is able to prove that Ferry and/or Hurney conspired with CCSC.