**Irving KAS, on behalf of himself and all others similarly situated, Plaintiff,**

v.

**FIRST UNION CORPORATION, First Union Corporation of Virginia and Warner N. Dalhouse, Defendants.**

**Civ. A. No. 3:93cv262.**

United States District Court, E.D. Virginia, Richmond Division.

July 11, 1994.

---

483

Eric M. Page, Thorsen, Page & Marchant, Richmond, VA, Arthur N. Abbey, Judith L. Spanier, Abbey & Ellis, New York City, for plaintiff.

Michael W. Smith, Craig T. Merritt, J. Tracy Walker, Christian, Barton, Epps, Brent & Chappell, Richmond, VA, for defendants First Union Corp. and First Union Corp. of VA.

Douglas W. Densmore, Kevin P. Oddo, Woods, Rogers & Hazlegrove, Roanoke, VA, for defendant Warner N. Dalhouse.

## MEMORANDUM OPINION AND ORDER

PAYNE, District Judge.

This matter is before the court on the motion for summary judgment filed jointly by First Union Corporation ("First Union"), First Union Corporation of Virginia ("First Union Virginia"), and Warner N. Dalhouse ("Dalhouse"). The plaintiff, Irving Kas, voluntarily dismissed Count III of the four count Amended Complaint, and the defendants seek judgment on the three remaining counts.[1]

Count I is a claim against all defendants under Section 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C.A. § 78j(b) (West 1981), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.-10b–5 (1992) (liability for manipulative or deceptive practices in connection with the purchase or sale of a security). Count II is a

---

1. Count III, which alleged a claim against all defendants under Section 11 of Securities Act of 1933, 15 U.S.C.A. § 77k(a)(1)–(5), and a claim against Dalhouse as a "control person" under Section 15 of that Act, 15 U.S.C.A. § 77o (West 1981 Supp.1993), was dismissed with prejudice by agreed order on November 2, 1993.

claim against Dalhouse as a "control person" under Section 20 of the 1934 Act, 15 U.S.C.A. § 78t (West 1981 & Supp.1993). Count IV is a claim against all defendants under Section 14 of the 1934 Act, 15 U.S.C.A. § 78n, and Rule 14a–9 promulgated thereunder, 17 C.F.R. § 240.14a–9 (1992) (liability for solicitation using a proxy statement which contains false statements or omissions of material fact). For the reasons set forth below, the motion for summary judgment on all remaining counts is granted, and the Amended Complaint is dismissed with prejudice.

## STATEMENT OF FACTS

First Union, a North Carolina corporation, is a multi-bank holding company which provides a wide range of commercial and retail banking services. First Union Virginia is a Virginia banking corporation and a wholly-owned subsidiary of First Union. Dominion Bankshares Corporation ("Dominion"), a Virginia corporation, was until March 1, 1993, a publicly traded multi-bank holding company. Warner Dalhouse was a director of Dominion from 1977 to 1993, and he served as Chairman of the Board and Chief Executive Officer of Dominion from 1989 until March 1, 1993.

On September 21, 1992, First Union, First Union Virginia, and Dominion announced that they had entered into an Agreement and Plan of Merger ("the Merger Agreement"), under which Dominion agreed to merge into First Union Virginia. On February 16, 1993, First Union declared a first quarter dividend of $0.35 per share, and established February 26, 1993, as the record date for payment of that dividend. On March 1, 1993, the Dominion/First Union Virginia merger was consummated.

The gist of Kas' claims is that the defendants made false representations when, in a Notice of Special Stockholders Meeting and a Prospectus/Proxy Statement ("the Proxy Statement") issued on November 12, 1992, they represented that they would use their "best efforts" to "permit consummation of the Merger at the earliest practicable date." These representations are material, Kas asserts, because if the defendants in fact had used their "best efforts," the merger would

have been consummated on February 26, 1993, the record date for First Union's first quarter dividend, and Dominion shareholders would have been entitled to the $0.35 per share dividend. Kas acknowledges that the materials issued on November 12, 1992, stated that the closing was expected in the first quarter of 1993, and that the closing occurred in the first quarter of 1993, on March 1. Nonetheless, the Amended Complaint charges that "the defendants' statements in the Prospectus/Proxy Statement created the materially false and misleading impression that defendants would take and were taking all actions to permit the Merger [to] close 'at the earliest possible date' in the first quarter of 1993."

The facts which form the basis for Kas' theory are set forth below.

### A. Circumstances Surrounding the Merger

The Merger Agreement was publicly announced on September 21, 1992. On November 12, 1992, Dominion disseminated to its shareholders the Notice of Special Meeting of Shareholders and the Proxy Statement. The Proxy Statement was furnished in connection with the solicitation of proxies by Dominion's board of directors for use at a special meeting of Dominion shareholders to be held on December 22, 1992, to consider and vote upon a proposal to approve the Merger Agreement. Under the terms of the Agreement as explained in the Proxy Statement, First Union agreed that Dominion shareholders would receive 0.58 shares of First Union common stock for each share of Dominion common stock which was issued and outstanding as of the Merger Effective Date. It also provided that Dominion shareholders who exchanged their Dominion shares for First Union shares would receive any dividends declared by First Union after the Merger Effective Date.

It is undisputed that all participants in the merger wanted it to be consummated as promptly as possible because Dominion was losing deposits, suffering from diminished employee morale and had received a "troubled bank" letter from the Office of the Comptroller of the Currency. As set forth in

the Proxy Statement, in a paragraph entitled "Merger Effective Date," the merger was to become effective

> on the date and at the time that the State Corporation Commission of Virginia issues a certificate of merger evidencing the effectiveness of the Merger. Unless otherwise agreed upon in writing between [First Union] and Dominion, and subject to the conditions to the obligations of the parties to effect the Merger, the parties have agreed to use their best efforts to cause the Merger Effective Date to occur on the first business day following the last to occur of: (i) the latest effective date (including the expiration of any applicable waiting period) of the required federal or state regulatory approvals of the Merger; and (ii) the date on which the Merger Agreement and the related Plan of Merger are approved by the requisite vote of the stockholders of the parties thereto....

The Summary section of the Proxy Statement identified which regulatory approvals were required to satisfy section (i) of the Merger Effective Date requirements. Under the heading "Regulatory Approvals," it stated:

> The Merger is subject to the prior approval of the Federal Reserve Board and of the Superintendent of Banking and Financial Institutions of the District of Columbia, the Bank Commissioner of the State of Maryland, the Commissioner of Financial Institutions of the State of Tennessee and the State Corporation Commission of Virginia (collectively, the "State Banking Authorities"). Applications have either been filed or will be filed in the near future with each of such regulatory authorities for approval of the Merger. There can be no assurance that the necessary regulatory approvals will be obtained or as to the timing or conditions of such approvals.

In another section, the Proxy Statement reiterated the defendants' intentions to use their "best efforts" to consummate the merger as soon as practicable, stating that each would

> use its best efforts in good faith to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary,

proper or desirable, or advisable under applicable laws, as promptly as practicable so as to permit consummation of the Merger at the earliest possible date ... and ... use, and ... cause each of their respective subsidiaries to use, its best efforts to obtain all consents (governmental or other) necessary or desirable for the consummation of the transactions contemplated by this Plan ...

However, the Proxy Statement also cautioned that, although all the parties wanted the merger to occur as soon as practicable, closing was conditioned upon approval of the transaction by state and federal regulatory bodies and satisfaction or waiver of other conditions precedent to the merger. Further, it expressly warned that there could "be no assurance that the necessary Federal Reserve Board or any other required regulatory approvals of the Merger will be obtained (or as to the timing or conditions thereof)."

The Proxy Statement also contained a number of disclosures that the merger might never take place. For example, the Proxy Statement warned that the Merger Agreement could be terminated: (i) if the closing did not occur on or before September 30, 1993; (ii) if certain stock price changes occurred; or (iii) if there was mutual agreement between the Boards of Directors of First Union and Dominion to terminate the merger.

Nonetheless, the Proxy Statement also contained a predicted time frame for consummation of the merger. In the paragraph entitled "Merger Effective Date," immediately after enumerating the conditions precedent to the merger, the Proxy Statement represented that subject to fulfillment of those conditions, the defendants "currently anticipated that the Merger will be consummated in the first quarter of 1993."

On December 22, 1992, following the shareholder's meeting, Dominion shareholders approved the merger. On January 11, 1993, First Union announced that it had received federal approval for the merger. On Tuesday, February 23, 1993, the Virginia State Corporation Commission ("VSCC") removed the last regulatory barrier to the

merger. On Thursday, February 25, 1993, the defendants filed Articles of Merger with the VSCC, which specified that they would become effective at 5:00 p.m. on Monday, March 1, 1993.[2] The VSCC then issued a Certificate of Merger authorizing the proposed transaction and making March 1, 1993, the Merger Effective Date.

### B. Public Statements Respecting The Closing Date

From the day the proposed merger was publicly announced on September 21, 1992 until the merger was consummated on March 1, 1993, there were numerous public announcements concerning the projected closing date. At least fifty press releases and newspaper reports issued before January 4, 1993, uniformly predicted a merger closing date of late March 1993 or Spring 1993. The internal documents of Dominion and First Union and their letters and memoranda to employees, shareholders, customers and state banking authorities created before mid-January 1993 also indicated that the parties projected that the merger would close on or about March 31, 1993. After the Federal Reserve Board approved the merger on January 11, 1993, Dominion employees were informed in late January that the predicted closing date had been accelerated to March 1, 1993. At about this same time, press reports also began to reflect the March 1 projected closing date.

### C. The First Union Dividend

As explained above, the Merger Effective Date determined when former Dominion shareholders would begin to receive dividends from First Union. Because First Union declared its first quarter dividend at the annual meeting of its board of directors on February 16, 1993, to be payable to shareholders of record on February 25, 1993, the *Dominion shareholders were not entitled to* the $0.35 per share dividend which is at issue in this action. It is necessary therefore to examine the circumstances surrounding declaration of the dividend.

The record establishes that First Union generally holds its first quarter board meeting in mid-February, at which time the board sets the record date for the first quarter dividend for the Friday after that meeting. Since 1990, the record date for the first quarter dividend has been on or about February 28. For the twenty-five years before 1993, First Union never declared a first quarter dividend for which the record date was later than March 4, and during that time period only three record dates fell in March.

In 1993, the date of the first quarter board meeting and the record date of the quarterly dividend followed First Union's historical practices. The board of directors met on February 16, 1993, which was the third Tuesday of February. At that meeting, the board declared a first quarter dividend of $0.35 per share and established the record date for payment as February 26, 1993, which was the Friday of the following week. The undisputed record is that First Union's board of directors did not discuss whether Dominion shareholders would receive a dividend.

### D. The Present Action

The value of Dominion stock rose substantially after the announcement of the proposed merger. On September 10, 1992, Dominion stock closed at $12.88 per share. When the merger was announced on September 21, 1992, the stock's closing price rose to $19.625. The stock continued to increase in value until the merger effective date, when Dominion shareholders became eligible to exchange their shares for First Union shares which, based on the merger exchange ratio of 0.58 to one, were worth $27.405 per Dominion share.

On November 18, 1992, Kas purchased 500 shares of Dominion stock at a price of $21.18 per share, for a total purchase price of $10,593.75. On January 4, 1993, Kas purchased an additional 517 shares of Dominion stock at $24.48 per share, for a total purchase price of $12,656.16. On March 1, 1993, Kas, like all Dominion shareholders, became entitled to

---

**2.** Virginia Code § 13.1–606 provides that a certificate of merger issued by the VSCC is effective at the time such certificate is issued unless "the articles state the certificate shall become effective at a later time and date specified in the articles."

exchange each of his Dominion shares for 0.58 shares of First Union common stock, valued at that time at $47.25 per share. Kas exchanged his 1017 shares of Dominion stock for 589.86 shares of First Union stock, realizing a profit of $4,620.91 on his $23,249.91 Dominion investment. Notwithstanding that he realized a profit of almost 20% on his Dominion investment, Kas instituted this action claiming to have lost $207 (less than 1% of his investment) when he did not receive the $0.35 first quarter First Union dividend.

The action was provisionally certified as a class action under Fed.R.Civ.P. Rule 23 on June 23, 1993, and full certification was granted on October 14, 1993. Following full discovery and briefing, the court heard oral argument on the motions, at the conclusion of which the motions for summary judgment were granted. This Memorandum Opinion and Order sets forth the reasons in support of that decision.

## DISCUSSION

Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court is not to weigh the evidence, but rather must "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In so doing, the court must view the underlying facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interroga-

tories, and admissions on file, together with affidavits, if any,'" that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Catawba Indian Tribe v. South Carolina*, 978 F.2d 1334, 1338 (4th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993). Once this initial showing under Rule 56(c) is made, the burden of production, but not persuasion, shifts to the non-moving party. The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *see also* Fed.R.Civ.P. 56(e); *Catawba Indian Tribe*, 978 F.2d at 1338.

To show that there is a genuine issue for trial, the non-moving party must do more than simply show that there is some metaphysical doubt as to a disputed fact. It must make a specific showing of material facts which are in dispute. The Supreme Court of the United States has stated:

[T]he mere existence of some alleged factual dispute between the parties will not defeat ... a motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts which might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2510. Considering these controlling principles, the court turns to the merits of the motion.

Count I of the Amended Complaint alleges that the defendants violated Section 10(b)[3]

**3.** Section 10(b) provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means ... (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative

or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C.A. § 78j (West 1981).

and Rule 10b–5[4] by making a number of false statements and one omission of a material fact in the November 12, 1992, Proxy Statement which had the effect of leading Dominion shareholders to believe that the merger would close in time for them to be eligible for the First Union first quarter dividend. The three statements which Kas cites as false are the following: (1) that defendants would use their "best efforts" to cause the merger effective date to occur "on the first business day" following receipt of the last of the required shareholder and regulatory approvals; (2) that defendants would use their "best efforts . . . to take, or cause to be taken, all actions . . . so as to permit consummation of the Merger at the earliest possible date;" and (3) that applications for the required regulatory approvals either have been filed or will be filed "in the near future." The alleged omission of material fact cited by Kas was the defendants' failure to disclose in the Proxy Statement the existence of a regulatory approval or waiver required to consummate the merger in addition to those approvals listed in the Proxy Statement: namely, a waiver of the requirement to file an application with the Small Business Administration.

 "To establish liability under § 10(b) and Rule 10(b)–5, a plaintiff must prove the following elements: '(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages.'" *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1260–61 (4th Cir.1993) (quoting *Myers v. Finkel*, 950 F.2d 165, 167 (4th Cir.1991)). In order to prove that the defendants in this matter made a false statement or omission of material fact, the plaintiff must establish that the defendants' statements or omissions of fact respecting the merger closing date were false

when made. *Berliner v. Lotus Development Corp.*, 783 F.Supp. 708, 710 (D.Mass.1992). It is well-settled that "fraud by hindsight" is not actionable under Section 10(b) or Rule 10b–5. *Borow v. nVIEW Corp.*, 829 F.Supp. 828, 835 (E.D.Va.1993); *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978). Likewise, a true statement does not fall within the ambit of Rule 10b–5. *Safecard Serv., Inc. v. Dow Jones & Co.*, 537 F.Supp. 1137, 1143 (E.D.Va. 1982), *aff'd* 705 F.2d 445 (4th Cir.1983), *cert. denied* 464 U.S. 831, 104 S.Ct. 109, 78 L.Ed.2d 111 (1983). Because Kas is unable to prove that the defendants made any false statement, and because as a matter of law he is unable to show that the alleged omission was material, these claims are without merit. Each statement and omission will be addressed in turn.

## A. *Defendants' Alleged False or Misleading Statements*

 The first allegedly false statement made by the defendants was that they would use their "best efforts" to cause the merger effective date to occur "on the first business day" following receipt of the last of the required shareholder and regulatory approvals. It is undisputed that the last shareholder or regulatory barrier to the merger was removed on Tuesday, February 23, 1993; that the defendants did not file Articles of Merger with the VSCC until Thursday, February 25, 1993; and that in the Articles of Merger the defendants specified that the merger was to become effective at 5:00 p.m. on Monday, March 1, 1993. Because the merger did not become effective until four business days after the last approval was received, Kas contends that the defendants' statement was false in violation of Section 10(b) and Rule 10b–5.

---

4. Rule 10b–5 provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
 17 C.F.R. § 240.10b–5 (1992).

The record does not support this allegation. As noted above, in order for a statement to be actionable under Section 10(b) or Rule 10b–5, Kas must establish that the statement was false when made. *Berliner, supra.* There is no evidence in the record that the defendants' statement was false when made. Kas contends that a reasonable jury could find that the statement was false when made because as early as October 1992 First Union's internal financial plans assumed a merger date of March 31, 1993, "a date after the record date for the payment of the first quarter dividend." From this single fact, Kas argues that a reasonable jury could reach the conclusions that First Union "had no expectation of ... paying a first quarter dividend" to Dominion shareholders, and, more importantly, that "under no circumstances" was First Union going to issue shares to Dominion shareholders "until after the February 26, 1993, dividend record date."

At the outset, the court notes that one of the conclusions Kas would have a jury reach—that First Union "had no expectation" of paying the first quarter dividend to "Dominion shareholders"—is irrelevant to a determination of falsity. Whether First Union "expected" to pay the dividend to Dominion shareholders has nothing to do with the question of whether the defendants intended to use their "best efforts" to effectuate the merger.

Kas further asserts that "under no circumstances" would First Union have paid Dominion shareholders the first quarter dividend. The only fact on which he predicates this assertion is wholly insufficient for a reasonable jury to find that the defendants' "best efforts" statements were false when made. The mere fact that, as early as October 1992, First Union internal financial plans assumed a March 31, 1993, merger date is of no probative value. First Union's internal financial plans used the March 31 date, which falls within the first quarter of 1993, because it was the initial target date for closing the merger. Moreover, the March 31 date was no secret: over fifty press releases and newspaper reports published before January 4, 1993, uniformly predicted a closing date of around March 31, or Spring 1993, as did

Dominion and First Union documents to employees, shareholders, and customers. In late January, after the Federal Reserve Board approved First Union's application, the target date was advanced to March 1, and press reports reflected the new target date. The fact that First Union used March 31, 1993, a publicly known target date, in its internal financial plans provides no basis for the leap of logic that Kas needs a jury to make in order for him to survive summary judgment: that "under no circumstances" would the defendants have closed the merger in time for Dominion shareholders to receive the First Union dividend. Therefore, because there is no evidence that the defendants' statement was false when made, it is not actionable under Section 10(b) and Rule 10b–5. *See, Berliner, supra.*

█ The same result obtains with respect to the other two statements which Kas asserts are actionable. There is no evidence in the record that either the statement that defendants would use their "best efforts ... to take, or cause to be taken, all actions ... so as to permit consummation of the Merger at the earliest possible date," or the statement that applications for the required regulatory approvals either have been filed or will be filed "in the near future," were false when made. Therefore, they also are not actionable under Section 10(b) and Rule 10b–5.

█ It is undisputed that First Union documents to shareholders, as well as numerous press releases and newspaper articles, projected a merger closing date of around March 31, more than three weeks later than the latest first quarter dividend record date ever set by First Union. Due to expedited federal approval of the merger, the projected closing date was accelerated to March 1, 1993, the date the merger eventually closed. In this context, none of defendants' statements pledging to use their "best efforts" or that the necessary regulatory forms would be submitted "in the near future" can be construed as false or misleading. The securities laws "do not require that investors be treated 'like children' ... [i]nvestors know that the stock market is a risky business, and that when a company's officers make predictions ... they are not issuing guarantees." *Kowal*

*v. MCI Communications Corp.*, 1992 WL 121378, *7, 1992 U.S. Dist. LEXIS 7437, at *25 (D.D.C.1992). In essence, Kas' claim boils down to the allegation that because the defendants did not act in February 1993 in the manner which he desired, defendants' statements made in the November 1992 Proxy Statement must have been false or misleading when they were made. This is nothing more than an allegation of "fraud by hindsight," not actionable under the securities laws. *Borow v. nVIEW Corp., supra.*

▮ Even if the court were to find that the defendants' statements were false when made, Kas' claim would not be actionable. The statements that the defendants had "agreed to use best efforts" to consummate the merger, and that they would "in the near future" file applications for necessary regulatory approvals, are not promises or guarantees respecting when the merger would close. Those statements are, if anything, simply optimistic projections concerning future performance. Because of their inherently indefinite nature, "projections of future performance not worded as guarantees are generally not actionable under the federal securities laws." *Raab v. General Physics Corp.*, 4 F.3d 286, 290 (4th Cir.1993). As the United States Court of Appeals for the Fourth Circuit explained in *Raab:* "Analysts and arbitragers rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen." 4 F.3d at 290. Because defendants' statements were no more than "expressions of optimism" about the future consummation of the merger, they are not actionable under § 10(b) or Rule 10b–5.

▮ Moreover, defendants' statements do not go to a material fact, because, in order for a fact to be material, there must be "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). To meet this requirement, a shareholder is not required to prove that disclosure of the false or omitted fact would have caused him to change his vote. Rather, the "reasonable investor" test states that a fact or omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have significantly altered the 'total mix' of information made available." *Basic v. Levinson*, 485 U.S. 224, 231–232, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. at 449, 96 S.Ct. at 2132). Because the question of materiality is a mixed question of law and fact, summary judgment is appropriate only when "reasonable minds cannot differ on the question of materiality." *Johns Hopkins v. Hutton*, 422 F.2d 1124, 1129 (4th Cir.1970).

Kas contends that, notwithstanding the steady and substantial increase in the value of Dominion stock from November 1992 to March 31, 1993, and notwithstanding that as a result of the merger he made a profit of $4,620.91 on his $23,249.91 investment in little over four months, his decisions to invest in Dominion and to vote in favor of the merger would have been "significantly altered" had he known that the defendants' statements about using "best efforts" or filing approvals "in the near future" were not true, and as a result he would not receive First Union's $0.35 per share first quarter dividend upon the exchange of his Dominion stock. Had Kas been eligible for the dividend, he would have received a total of $207, less than one percent of his total investment.[5] Given the facts that he received a large return in a short period of time on his Dominion investment, and that the dividend on which he predicates this action represents less than one percent of his total investment, the court finds that, even if Kas had known that he could not receive the dividend, there is no likelihood that the disclosure of that fact "would have significantly altered the 'total mix' of information made available" to him, *Basic*, 485 U.S. at 231–232, 108 S.Ct. at 983, or that he would have considered it important in deciding how to vote on the proposed merger. *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. at 2132.

---

5. Because of the 0.58 to one conversion ration, 35 cents per First Union share was the equivalent of approximately 20 cents per dominion share.

This finding is applicable to all Dominion investors who are part of this action. The value of Dominion stock increased substantially during the period that the merger proposal was being executed: from $12.88 per share on September 10, 1992, to $19.625 per share on September 21, 1992, the day the merger was announced, to $27.405 on the day of the merger. In addition, for Dominion stockholders the exchange of their shares for First Union shares meant a resumption of quarterly dividends, which Dominion had stopped producing earlier in the year. These facts, coupled with the *de minimis* nature of the First Union first quarter dividend, both in terms of the actual dollar amount and the percentage of the investor's profit or investment, make clear that there is no likelihood that "the disclosure of the omitted fact would have significantly altered the 'total mix' of information made available" to any Dominion investor, *Basic,* 485 U.S. at 231–232, 108 S.Ct. at 983, or that any investor would have considered it important in deciding how to vote on the proposed merger. *TSC Indus.,* 426 U.S. at 449, 96 S.Ct. at 2132.

■ Furthermore, if, as in this case, an alleged omission "involves speculative judgment about future events ... materiality 'will depend at any given time upon a balancing of both the *indicated probability* that the event will occur and the *anticipated magnitude of the event* in light of the totality of the company activity." *Milton v. Van Dorn Co.,* 961 F.2d 965, 969–70 (1st Cir.1992) (quoting *Basic,* 485 U.S. at 238, 108 S.Ct. at 987) (emphasis in original). This assessment is made in light of all surrounding circumstances. *TSC Indus.,* 426 U.S. at 449, 96 S.Ct. at 2132. Applying the balancing test to the present facts, the "indicated probability" that the merger would close prior to the February 26, 1993, record date for First Union's first quarter dividend is nil. As of January 4, 1993, the date of Kas' last Dominion stock purchase, the projected closing date was March 31. Moreover, First Union never set a projected closing date earlier than March 1, 1993, three days after the dividend record date. Likewise, the "anticipated magnitude of the event in light of the totality of the company activity" is also essentially nil, given the small size of the dividend in relation to

both the purchase price of the stock and the profit realized by Dominion shareholders as a result of the merger. Under these facts, the defendants' statements, insofar as they might affect Dominion shareholders' receipt of the first quarter dividend, are not material as a matter of law, and therefore not actionable under the securities laws.

### B. *Defendants' Alleged Omission of a Material Fact*

■ In addition to the alleged false statements, Kas also contends that defendants omitted a material fact from the Proxy Statement: that they required a waiver from the Small Business Administration in order to close the merger. However, assuming *arguendo* that failure to disclose this requirement constitutes an omission, it is not actionable under Section 10(b) or Rule 10b–5 because it does not go to a material fact. Failing to disclose the requirement is not material because the defendants' receipt of the SBA waiver did not impede, or even affect, the ability of Dominion shareholders to receive the First Union dividend. The waiver was requested by FUNC on March 1, 1993, and apparently received that same day. There was no reason the request could not have been transmitted to the SBA prior to March 1: in fact, the record establishes that it could have been transmitted on February 26. Therefore, the existence of the SBA requirement, and hence its omission from the Proxy Statement, was not material to whether Dominion shareholders would receive the dividend.

Furthermore, the omission of the requirement is not material as required by Section 10(b) because, as set forth fully above, even if Kas had been informed of the existence of the additional requirement, it would not have "significantly altered the 'total mix' of information made available" to him, *Basic,* 485 U.S. at 231–232, 108 S.Ct. at 983, or been important to his decision how to vote on the proposed merger. *TSC Indus.,* 426 U.S. at 449, 96 S.Ct. at 2132. Therefore, because it would not have had any effect on the Dominion shareholders' receipt of the first quarter dividend, the omission was not material as a

matter of law, and therefore not actionable under the securities laws.

Because Kas cannot establish that defendants made a false statement or omission of material fact, summary judgment is granted on Count I.[6] Because Count II, which alleges that Dalhouse is liable as a "control person" under Section 20 of the 1934 Act, also requires a finding of a false statement or omission of material fact, summary judgment is granted on Count II. Likewise, because Count IV, which alleges a violation of Section 14(a) of the 1934 Act and Rule 14a–9, requires a finding of a false statement or omission of material fact in the proxy materials, summary judgment is also granted as to Count IV. *See Sandberg v. Virginia Bankshares, Inc.,* 891 F.2d 1112, 1121 (4th Cir. 1989).

## CONCLUSION

For the foregoing reasons, defendants' joint motion for summary judgment is granted on all counts, and plaintiff's amended complaint is hereby dismissed.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to all counsel of record.

It is so ORDERED.

---

6. The court notes that even had Kas been able to establish the existence of a false statement or omission of material fact, he would fail both the "scienter" requirement, as defined in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), and the requirement that he have justifiably relied on the false statement. *See Cooke,* 998 F.2d at 1262–63 (where market was "so overwhelmed with information" concerning difficulties facing company that presumption of reliance was rebutted and summary judgment was appropriate); *Raab,* 4 F.3d at 289 ("in a fraud on the market case, the defendant's failure to disclose material information may be excused where that information has been made credibly available to the market by other sources.")