John FAULKNER, William Campaigne, Harry Haidet, and Coolidge C. Elder, as Trustee on Behalf of the Coolidge C. and Hildegard N. Elder Revocable Trust, Plaintiffs,

v.

VERIZON COMMUNICATIONS, INC., Defendant.

No. 01 CIV. 1846(WCC).

United States District Court, S.D. New York.

Aug. 3, 2001.

Lowey Dannenberg Bemporad & Selinger, P.C. (Stephen Lowey, David C. Harrison, Michelle Rago, Stacey Blaustein, Of Counsel), White Plains, NY, for Plaintiffs.

Kirkland & Ellis (William H. Pratt, Frank Holozubiec, Peter D. Doyle, Eric Hecker, Of Counsel), New York City, for Defendant.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiffs John Faulkner, William Campaigne, Harry Haidet, and Coolidge C. Elder, trustee on behalf of the Coolidge C. and Hildegard N. Elder Revocable Trust, purchasers of publicly traded notes issued by NorthPoint Communications Group, Inc. ("NorthPoint"), bring this action against defendant Verizon Communications, Inc. ("Verizon") pursuant to § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, for alleged fraudulent misrepresentations in connection with a contem-

plated merger with NorthPoint. Verizon now moves to dismiss the Complaint pursuant to FED. R. CIV. P. 12(b)(6) and 9(b). Plaintiffs cross-move to lift the automatic stay of discovery imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA") when a motion to dismiss is pending.

For the reasons stated hereinafter, Verizon's motion to dismiss is granted. However, plaintiffs are granted leave to amend the Complaint pursuant to FED. R. CIV. P. 15. Plaintiffs' cross-motion to lift the PSLRA stay is denied.

## BACKGROUND

### I. *Merger Between NorthPoint and Verizon*

Unless stated otherwise, the following facts are gleaned from the Complaint.

This suit is based on the anticipated merger between Verizon and NorthPoint, agreed to by the corporations in 2000 and scheduled to close in 2001.

Plaintiffs, individually and on behalf of the represented Class, purchased 12⅞% Senior Notes issued by NorthPoint (the "Notes"), between November 14, 2000 and November 29, 2000 (the "Class Period"). (¶ 1.) Plaintiffs purchased the Notes at prices between 0.9275 and 0.9850 times their face value. (¶ 12.) The Notes contained a "change of control" feature which obligated NorthPoint to offer to purchase the Notes at 101% of the aggregate principal amount of the Notes plus accrued and unpaid interest if the consummation of a transaction, *e.g.*, a merger, resulted in another entity owning more than 50% of the total voting stock or total common equity of the company. (¶¶ 20–21.)

Verizon, the resulting entity of a merger between Bell Atlantic Corporation and GTE Corporation, is the largest provider of wireline and wireless communications and the second largest provider of digital subscriber line ("DSL") services in the United States. (¶ 13.) It operates in 40 countries, has approximately 2.7 billion shares of outstanding common stock and, in 1999, generated approximately $60 billion in revenues. (¶¶ 13–14.)

NorthPoint, formed in 1997, was a national provider of highspeed, local data network services which use DSL technology to transport data over telephone company copper lines 25 times faster than common dial-up modems. (¶¶ 15–16.) As a start-up DSL service provider, it incurred massive losses and negative cash flow. In 1999, it reported net losses of $440 million. (¶ 25.) In its Form 10–Qs, it reported negative cash flow from operations and investing activities in the amount of $406 million for the six-month period ending June 30, 2000, which increased to $595 million by September 30, 2000. (*Id.*) Indeed, NorthPoint reported increasing net losses of $80 million, $112 million and $136 million, for the first, second and third quarters of the 2000 fiscal year. (¶ 24.) Moreover, in accordance with the securities laws, it repeatedly advised its investors that it expected its operating expenses and losses to increase in the future. (¶¶ 22–23.)

On August 7, 2000, NorthPoint and Verizon entered into a Merger Agreement. (¶ 29.) Pursuant to the Merger Agreement and the accompanying Funding Agreement, Verizon agreed to contribute $800 million in cash ($450 million to fund NorthPoint's capital expenditures and operations and $350 million to be paid to NorthPoint's shareholders) and more than $500 million of Verizon DSL assets in exchange for a 55% equity interest in NorthPoint. (¶ 27.) Verizon also agreed to provide interim financing of $200 million by January 1, 2001 and to purchase $150 mil-

lion of NorthPoint nonvoting 9% convertible preferred stock. (¶ 28.)

The Merger Agreement contained three relevant provisions. First, Verizon was required to (1) "use all commercially reasonable efforts to obtain in a timely manner all necessary waivers, consents and approvals and to effect all necessary registrations and filings" and (2) "use all commercially reasonable efforts to take, or cause to be taken, all other actions and to do, or cause to be done, all other things necessary, proper or advisable to consummate and make effective as promptly as practicable the transactions contemplated by this [Merger] Agreement." (¶ 29.) August 7, 2001 was the scheduled termination date. (*Id.*) Second, the parties agreed not to "issue any press release or public statement with respect to this [Merger] Agreement or the transactions contemplated hereby . . . without prior consent" of the other entity. (¶ 30.) Third, Verizon was given the right to terminate only in the case of a Material Adverse Effect, defined as "any fact, event, change or effect having, or which will have, a material adverse effect on the business, operations, properties . . ., financial condition, assets or liabilities of NorthPoint . . . ." (¶¶ 32–33.)

On August 8, 2000, Verizon and North-Point jointly announced the proposed merger. (¶ 35.) In this announcement, Verizon proclaimed, *inter alia,* that the merger was a "groundbreaking agreement to fundamentally change the dynamics of the broadband industry." (¶ 37.) Verizon Vice-Chairman, President and Chief Operating Officer Lawrence T. Babbio (¶¶ 37, 44) represented that "this deal combines complementary assets—Verizon's position in the consumer market and NorthPoint's presence with business customers—to provide the scale to fuel growth and deliver the full benefits of high speed connections." (¶ 37.) Verizon CEO Ivan Seiden-

berg extolled the merger as one which "will take us a long way toward achieving national scale in our broadband operations and putting another 'piece of the bundle in place.'" (¶ 39.)

From NorthPoint's perspective, the market reacted relatively well to the news of the merger. Following the August 8, 2000 announcement, the market price of the NorthPoint's $1,000 Notes increased from approximately $600 to approximately par, or $1,000. (¶ 36.) Conversely, the market value of Verizon's stock plummeted. For example, on August 7, 2000, 5 million Verizon shares were traded, closing at a price of $47⅞ per share. On August 8, 2000, 33 million shares were traded, closing at a price of $42 ½ per share. On August 9, 2000, 22 million shares were traded, closing at a price of $40⅝ per share. (¶ 57.)

Moreover, the merger received negative reactions from analysts. On August 9, 2000, *Paine Webber* bluntly stated that it did not understand the transaction and remarked that "Verizon gave up too much to get too little." (¶ 58.) Similarly, on the same day, the *New York Times* described the merger as a "peculiar structure" and predicted that the merger will dilute "Verizon's per-share earnings growth by about 5 percent." (¶ 59.)

Nevertheless, in its Form 10–Q filed on August 14, 2000, for the period ending June 30, 2000, Verizon represented that the Merger was expected to be completed in mid–2001. (¶ 40.) On September 6, 2000, NorthPoint and Verizon issued a joint press release in which they announced that Verizon had funded $150 million through the purchase of preferred stock and that they "expect[ed] the deal to close by mid–2001." (¶ 43.) In the October 2000 edition of *Telecommunications,* Babbio stated that "the new strategy will expand broadband choice for customers by

providing a superior alternative to cable." (¶ 44.) On October 26, 2000, NorthPoint Chief Executive Officer Liz Fetter stated in a conference call that "the merger with Verizon continues on schedule" and "[t]wo months after the announcement, we are even more excited by what the deal holds, not only for NorthPoint, but also for the future of the broadband industry. *We continue to be on track for a closing in the first half of 2001 ...*" (¶ 45 (emphasis in original).)

On October 26, 2000, NorthPoint filed its Form 10–Q for its third fiscal quarter, reporting operating losses of $106 million and net losses of $125 million on revenues of approximately $30 million, but acknowledged it had opted not to recognize revenues for certain data industry customers in troubled financial condition. (¶¶ 46–47.) In any event, it confirmed, with Verizon's prior approval, that "[w]e continue to be on track with our prior expectation of doing the transaction in the first half of 2001." (¶ 46.)

Allegedly, during the next two weeks, NorthPoint's management advised Verizon's senior executives that it had decided to revise its previously disclosed third-quarter results and recognize total operating losses in the amount of $118 million and net losses in the amount of $136 million. (¶ 48.) Verizon gave no indication that a Material Adverse Effect had occurred. (¶ 50.) Instead, on November 14, 2000, Verizon filed its own Form 10–Q for the period ending September 30, 2000, which stated:

> During August 2000, we announced a merger with NorthPoint ... *We expect the Merger to close in 2001 ....* Upon completion of the Merger we will own 55% of NorthPoint and will consolidate its results.... In addition, we have agreed to make a cash investment in NorthPoint of $450 million. *Up to $350 million of this investment will be in the form of financing prior to the closing.* (*Id.* (emphasis in original).)

On November 20, 2000, NorthPoint, after receiving Verizon's prior consent, issued a press release announcing its revised third-quarter results, but reassured its investors that "*we continue to be on track with our prior expectation of closing the Verizon transaction in the first half of 2001.*" (¶ 51 (emphasis in original).) Finally, on November 29, 2000, Verizon announced that it was unilaterally terminating the Merger Agreement, on the basis that NorthPoint's revised third-quarter figures constituted a Material Adverse Effect under the Merger Agreement. (¶¶ 5, 52.)

The effects of Verizon's actions were fatal for NorthPoint. Soon after the termination, the market price of NorthPoint's notes plunged from $120 to $150 per Note, or 12–15% of their face value. (¶ 63.) By January 10, 2001, the Notes traded for less than 10% of their face value. (¶¶ 7, 67.) NorthPoint was force to reduce its workforce by 20%. (¶ 66.) Finally, on January 16, 2001, it filed for bankruptcy pursuant to Chapter 11 of the Bankruptcy Code. (¶ 68.) Conversely, the market price of Verizon's stock increased, and it received positive reactions from analysts. (¶ 62.)

Plaintiffs argue that Verizon's stated reasons for terminating the merger were a mere "pretext" for Verizon to avoid its financing obligations which had already had a negative impact on Verizon's near-term earnings. (¶¶ 5, 53.) Indeed, plaintiffs allege that no later than November 14, 2000, "Verizon was no longer using commercially reasonable efforts to consummate the Merger, but rather had soured on the deal and was exploring ways to justify terminating the Merger Agreement and its funding obligations" (¶ 56) of $200 million prior to January 1, 2001. (¶ 4.)

This was allegedly a result of the negative reaction the merger received from analysts and its concomitant stock price decline. (¶ 56.) NorthPoint argues that Verizon had known of the revised third-quarter results prior to the filing of its November 14, 2000 Form 10–Q as well as its approval of NorthPoint's November 29, 2000 press release. "The truth is that increases in NorthPoint's reported losses and negative cash flow were not contrary to expectations." (¶ 5; see ¶¶ 49, 53.)

## II. *Lawsuits Commenced by Verizon and NorthPoint*

On December 1, 2000, Verizon filed a lawsuit against NorthPoint in the Delaware Superior Court seeking a declaratory judgment that NorthPoint's financial difficulties constituted a Material Adverse Effect under the Merger Agreement. (¶ 64; see *Verizon Communications, Inc. v. NorthPoint Communications Group, Inc.*, Civ. No. 00C–11–240 (Del.Super.Ct. Dec. 1, 2000).)

On December 8, 2000, NorthPoint commenced a lawsuit against Verizon in the California Superior Court, San Francisco County (the "*NorthPoint* California litigation"), asserting claims of breach of contract, fraud, negligent misrepresentation, and violation of CAL. BUS. & PROF. CODE § 17200. (¶ 65; see *NorthPoint Communications Group, Inc. v. Verizon Communications, Inc.*, No. 317249 (Cal.Super.Ct. Dec. 8, 2000).)[1] It alleged that Verizon was without a basis to terminate the Merger Agreement and that its purported reasons were merely a pretext designed to free Verizon from its investment obligations and to lift its depressed stock prices. "In addition, Verizon and its management determined that Verizon could

destroy NorthPoint's business by reneging on the merger and could then usurp the DSL business opportunities of NorthPoint in Verizon's monopoly territory." (*NorthPoint* Cal. Complt. ¶ 35.) On June 14, 2000, after holding oral argument in connection with the fraud claim, the California Superior Court granted Verizon's motion to dismiss the fraud claim because of lack of specificity. (Def Reply Mem. Supp. Mot. Dismiss at 3 n. 2.) The court granted NorthPoint 30 days leave to amend its Complaint. (*Id.*)

On July 12, 2001, NorthPoint filed its Amended Complaint and on July 25, 2001, plaintiffs' submitted a copy to this Court requesting leave to amend the Complaint in this action pursuant to FED. R. CIV. P. 15(a). It is obvious that the *NorthPoint* California Amended Complaint was neither incorporated by reference nor integrally related to the Complaint in this action. Although it is a public document, we decline to take judicial notice of unproven allegations therein. *See infra* n. 9 Therefore, those allegations will not be considered in connection with this motion to dismiss.

## DISCUSSION

### I. *Applicable Law*

#### A. *Rule 12(b)(6)*

On a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept as true all of the well pleaded facts and consider those facts in the light most favorable to the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *Hertz Corp. v. City of*

---

[1]. NorthPoint withdrew its requests for injunctive relief and specific performance. (Holozubiec Decl. ¶ 2.)

*New York,* 1 F.3d 121, 125 (2d Cir.1993); *In re AES Corp. Sec. Litig.,* 825 F.Supp. 578, 583 (S.D.N.Y.1993) (Conner, J.). On such a motion, the issue is "whether the claimant is entitled to offer evidence to support the claims." *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683. A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Padavan v. United States,* 82 F.3d 23, 26 (2d Cir.1996) (*quoting Hughes v. Rowe,* 449 U.S. 5, 10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980)). Generally, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." 2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 12.34[1][b] (3d ed.1997); *see also Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1088 (2d Cir.1995). Allegations that are so conclusory that they fail to give notice of the basic events and circumstances of which the plaintiff complains, are insufficient as a matter of law. *See Martin v. New York State Dep't of Mental Hygiene,* 588 F.2d 371, 372 (2d Cir.1978).

■ In assessing the legal sufficiency of a claim, the court may consider those facts alleged in the complaint, documents attached as an exhibit thereto or incorporated by reference, *see* FED. R. CIV. P. 10(c); *De Jesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 69 (2d Cir.1996), and documents that are "integral" to plaintiff's claims,

even if not explicitly incorporated by reference. *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 46–48 (2d Cir.1991); *Lee v. State of New York Dep't of Corr. Servs.,* No. 97 Civ. 7112, 1999 WL 673339, at *2 n. 4 (S.D.N.Y. Aug. 30, 1999); *see United States Fidelity & Guaranty Co. v. Petroleo Brasileiro S.A.-Petrobas,* No. 98 Civ. 3099, 2001 WL 300735, at *2 (S.D.N.Y. Mar. 27, 2001) ("the Court can consider documents referenced in the complaint and documents that are in the plaintiffs' possession or that the plaintiffs knew of and relied on in their suit."). Pursuant to FED. R. EVID. 201(b), we may take judicial notice of pleadings in other lawsuits attached to the defendants' motion to dismiss, as a matter of public record, *see Rothman v. Gregor,* 220 F.3d 81, 92 (2d Cir.2000); *see, e.g., 5–Star Mgmt., Inc. v. Rogers,* 940 F.Supp. 512, 518 (E.D.N.Y.1996), as well as reports filed pursuant to Securities and Exchange Commission ("SEC") regulations as facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *See Kramer v. Time Warner Inc.,* 937 F.2d 767, 773–74 (2d Cir.1991) (limiting holding to forms required to be filed by the SEC and not press releases and announcements).

### B. *The PSLRA and Rule 9(b) Pleading Requirements*

To state a prima facie case under § 10(b) [2] and Rule 10b–5,[3] "a plaintiff must

---

**2.** Section 10(b) of the Securities Exchange Act of 1934 states, in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any secu-

rities-based swap agreement ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j(b).

**3.** Rule 10b–5 states, in pertinent part:
It shall be unlawful for any person, directly or indirectly, by the use of any means or

show that 'in connection with the purchase or sale of securities, the defendant, acting with *scienter*, made a false material misrepresentation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury.'" *Suez Equity Investors, L.P. v. Toronto Dominion Bank*, 250 F.3d 87, 95 (2d Cir.2001) (quoting *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir.1999) (alterations in original)).

In 1995, the Securities and Exchange Act was amended by the PSLRA, in order "to deter strike suits wherein opportunistic private plaintiffs file securities fraud claims of dubious merit in order to exact large settlement recoveries." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir.2000). In order to effectuate its goal, it places "stringent procedural requirements" on plaintiffs who pursue private securities fraud claims. *Id.* Therefore, with respect to scienter, the PSLRA mandates that in any private action wherein monetary damages are sought, "only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind.*" 15 U.S.C. § 78u–4(b)(2) (emphasis added). With respect to material misrepresentations and omissions, the PSLRA requires that,

> [i]n any private action arising under this chapter in which the plaintiff alleges that the defendant -

> (A) made an untrue statement of a material fact; or

> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed.

*Id.* § 78u–4(b)(1).

█ Securities fraud actions are also subject to the pleading requirements of FED. R. CIV. P. 9(b) which requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." To satisfy this requirement, "a complaint 'must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir.1999) (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 51 (2d Cir.1995)).

## II. *Scienter*

Verizon's threshold argument is that plaintiffs have failed to sufficiently allege scienter as required by Rule 9(b) and the

---

instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances un-

der which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

PSLRA. Although Rule 9(b) requires that allegations of fraud be plead with specificity, it also provides that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." In accordance therewith, the Second Circuit has held that "allegations may be based on information and belief when the facts are peculiarly within the opposing party's knowledge." *See Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990). However, these rules do not permit plaintiffs to state a claim based upon mere speculation and conclusory allegations. Instead, "[w]here pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard." *Id.; Vento & Co. of New York v. Metromedia Fiber Network, Inc.*, No. 97 Civ. 7751, 1999 WL 147732, at *7 (S.D.N.Y. Mar. 18, 1999). "Thus, a complaint 'which fails to adduce any specific facts supporting an inference of knowledgeable participation in the alleged fraud, will not satisfy even a relaxed standard.'" *Elliott Assocs., L.P. v. Covance, Inc.*, No. 00 Civ. 4115, 2000 WL 1752848, at *6 (S.D.N.Y. Nov. 28, 2000) (quoting *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir.1987)).

■ In sum, in order to satisfy the pleading requirements of Rule 9(b) and the PSLRA, "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." *Acito*, 47 F.3d at 52; *see also Novak*, 216 F.3d at 311 (holding that the PSLRA adopted the "strong inference" standard previously established by the Second Circuit).[4] The requirement of a strong inference is satisfied if the plaintiff

alleges facts either that "show that defendants had both motive and opportunity to commit fraud" or that "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Rothman*, 220 F.3d at 90; *see Stevelman*, 174 F.3d at 84.

### A. *Motive and Opportunity*

■ Even drawing all inferences in favor of plaintiffs, we conclude that they have failed to sufficiently allege any motive that Verizon may have had for making any of the above-mentioned statements. *See Press*, 166 F.3d at 538 ("The Second Circuit has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences."). Motive is established if the plaintiff alleges "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Novak*, 216 F.3d at 307 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994)). Opportunity is the "means and likely prospect of achieving concrete benefits by the means alleged." *Novak*, 216 F.3d at 307 (quoting *Shields*, 25 F.3d at 1130). "General allegations of motive 'possessed by virtually all corporate insiders' are insufficient to raise a strong inference of fraudulent intent." *In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041, 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) (quoting *Novak*, 216 F.3d at 307); *see, e.g., Chill v. General Elec. Co.*, 101 F.3d 263, 268 (2d Cir.1996) (desire to advance "the appearance of corporate profitability, or of the success of the investment"); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir.1996) (desire to maintain high credit rating); *Acito*, 47

---

4. Some of the cases cited and relied upon in this Opinion were decided prior to the passage of the PSLRA. Because the Second Circuit has held that pre-PSLRA cases may provide guidance as to how the 'strong inference'

standard may be satisfied, *see Novak*, 216 F.3d at 311, we find them persuasive. *See Covance*, 2000 WL 1752848, at *6 & n. 8 (citing *Wexner* with approval).

F.3d at 54 (desire to maintain high stock price to increase executive compensation); *Shields*, 25 F.3d at 1130 (desire to prolong benefits of corporate office). Instead, a plaintiff must "allege that defendants benefitted in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307–08.

■ Plaintiffs' claim is grounded on the theory that Verizon used NorthPoint's revised third-quarter results as "a mere pretext for terminating the Merger Agreement." (Pls. Mem. Opp. Mot. Dismiss at 23 (quoting Complt. ¶ 53).) Essentially, they argue that Verizon's alleged excuse for terminating the deal was to escape a $200 million funding commitment and avoid depression of near-term prices by negative analyst reports. (Complt. ¶¶ 33, 53, 56.) Although Verizon allegedly knew of the revised third-quarter results prior to November 14, 2000, it waited until NorthPoint's public announcement of the revised third-quarter earnings to bolster its claim that it constituted a Material Adverse Effect under the termination provision of the Merger Agreement.

This argument is unconvincing. We cannot perceive any concrete benefits Verizon could realize by deceiving North-Point's investors into believing that the merger was expected to proceed. Just the contrary, Verizon would obviously have benefitted by announcing its withdrawal from the merger immediately after learning of NorthPoint's revised third-quarter figures. The statements in Verizon's Form 10–Q and press release that it intended to proceed with the merger had the effect of substantially depressing its stock prices. It is simply illogical to conclude that if Verizon really had non-public knowledge of the revision of NorthPoint's third-quarter earnings and had decided to withdraw from the merger, it would have deliberately concealed that decision until the public announcement of the revision. Verizon's contractual right to terminate the merger did not depend on the timing of NorthPoint's public disclosures, and, once Verizon had decided to terminate, it had nothing to gain by deceiving North-Point's investors about that decision. We fail to understand plaintiffs' theory of liability; apparently they have confused an innocent motive to terminate with the requisite motive to defraud.[5]

### B. *Conscious Misconduct or Recklessness*

■ For the same reasons, the Complaint does not support an inference of conscious misconduct or recklessness. Recklessness is conduct "which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Novak*, 216 F.3d at 307 (quoting *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir. 1978)). It is a state of mind "approximating actual intent, and not merely a heightened form of negligence." *Novak*, 216 F.3d at 312 (citation omitted). Indeed, at least two judges of this court have stated that "plaintiffs must also show that defen-

---

5. The *NorthPoint* California Complaint alleges that Verizon and its management determined that Verizon could destroy NorthPoint's business by reneging on the merger and usurping the DSL business opportunities of NorthPoint in Verizon's monopoly territory. (*NorthPoint Cal.* Complt. ¶ 35.) The plaintiffs did not make any such allegation in the Complaint in this action. Even if we took judicial notice of the *NorthPoint* California Complaint, *see infra* n. 6, there were no facts alleged in that Complaint which would substantiate this claim. Furthermore, we fail to see how Verizon could advance that supposed nefarious scheme by giving false encouragement to NorthPoint's investors.

dants had a 'motive for deliberately shutting their eyes to the facts.'" *In re Northern Telecom Ltd. Sec. Litig.*, 116 F.Supp.2d 446, 465 (S.D.N.Y.2000) (Cedarbaum, J.) (quoting *In re Fischbach Corp. Sec. Litig.*, No. 89 Civ. 5826, 1992 WL 8715, at *7 (S.D.N.Y. Jan. 15, 1992) (Wood, J.)).

Despite such established definitions within this Circuit, the Court of Appeals concedes that "these general standards offer little insight into precisely what actions and behaviors constitute recklessness sufficient for § 10(b) liability." *Novak*, 216 F.3d at 308. However, after analysis of a number of prior securities fraud cases, the Second Circuit concluded that:

> securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.

*Id.*

■ In support of plaintiffs' argument of recklessness, they direct this Court's attention to paragraph 60 of the Complaint, which states that:

> [a]s a result of this adverse market and analyst reaction, and the unattractive economics of the deal given the substantial decline in NorthPoint's stock price since August 8, 2000, Verizon had a change of heart with respect to completing the Merger and committing additional funds to NorthPoint. Verizon's failure to disclose this change in position rendered its representation that it would use all commercially reasonable efforts to complete the Merger materially misleading.

However, contrary to plaintiffs' argument, the Complaint is devoid of any facts which would support the allegation that Verizon had "a change of heart prior to November 14, 2000." In fact, the Complaint alleges that on September 6, 2000, NorthPoint and Verizon issued a joint press release in which they announced that Verizon funded $150 million through the purchase of preferred stock. (¶ 43.) Thus, it appears that Verizon indeed expended "commercially reasonable efforts" to complete the merger. It did this even after the negative reaction by analysts and the stock price decline in early August, 2000.

We find Judge Scheindlin's recent decision in *Covance* apposite. In that case, two contract research organizations, Covance, Inc. ("Covance") and Parexel International Corporation ("Parexel") announced their intent to merge on April 29, 1999. 2000 WL 1752848, at *2. Relying on reassurances from the two companies that the merger was "on track" to close during the fall of that year, plaintiffs sold a large number of Covance shares short and bought Parexel's shares long between June 3 and June 24, 1999. *Id.* However, on June 25, 1999, Covance and Parexel issued a joint press release terminating the merger. *Id.* at *4. Plaintiffs claimed that the companies' asserted reasons for the termination were pretextual and that "[d]efendants knew by at least the beginning of June 1999—when both parties were making positive statements about the merger—that Parexel would suffer a significant revenue shortfall in its fourth quarter, endangering the Merger Agreement." *Id.* at *4. The plaintiffs further alleged that the defendants "clearly knew well before June 25, 1999 that the merger was likely to fail" and "[a]t a minimum, by June 24, 1999, just one day prior to the Termination of the Merger, Defendants clearly knew the information that resulted in the Termination of the Merger." *Id.* at

*4. Plaintiffs alleged that the "detailed nature of the [T]ermination [A]greement indicates that it could not have been prepared at the June 25, 1999 board meetings, and constitutes further evidence that Defendants knew in advance of June 25 that the Merger Agreement was going to be terminated." *Id.* at *3. Dismissing the complaint, Judge Scheindlin held that the "[p]laintiffs do not point to any concrete contrary information that would establish the falsity of the statements at issue. Rather, plaintiffs state, in all too conclusory terms, that 'Defendants clearly knew well before June 25, 1999 that the merger was likely to fail.'" *Id.* at *11. There was no circumstantial evidence suggesting fraudulent intent or recklessness. *See id.*

As in *Covance*, the Complaint here fails to allege any facts that would support an inference of recklessness. Although plaintiffs "do not have to fix the exact date and time" Verizon concluded that it would not go forward with the merger, plaintiffs "'must supply some factual basis for the allegation that the defendants had reached this conclusion at some point during the time period alleged.'" *Rothman*, 220 F.3d at 91 (quoting *Posner v. Coopers & Lybrand*, 92 F.R.D. 765, 769 (S.D.N.Y.1981)). Plaintiffs have provided no factual basis to support the claim that prior to November 14, 2000, Verizon had changed its mind and decided to terminate the merger.

Furthermore, we reject plaintiffs' argument that an inference of scienter must arise because of the temporal proximity between Verizon's November 14, 2000

statement and its sudden termination of the merger on November 29, 2000. Although the short time between the statements may allow for such an inference, *see Covance*, 2000 WL 1752848, at *7 n. 10, it is not compelling. To rule otherwise would be to conclude that the scienter element is satisfied whenever a change of mind closely follows a statement of intent. It is well settled within this Circuit that a plaintiff cannot establish a claim under § 10(b) or Rule 10b–5 through "fraud by hindsight." *Novak*, 216 F.3d at 309; *Stevelman*, 174 F.3d at 85. Because corporate officials need only to disclose "material facts reasonably available to them[,] . . . allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak*, 216 F.3d at 309 (citations omitted). In this case, plaintiffs have alleged nothing more than possible knowledge of the revised third-quarter earnings prior to the statements of November 14 and 20, 2000.

Moreover, plaintiffs have failed to plead with sufficient particularity that Verizon was aware of the revised third-quarter earnings prior to November 14, 2000. It is well settled that "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id.* Plaintiffs' claims rest solely on NorthPoint's allegations in the *NorthPoint* California litigation.[6] Even if we considered the *NorthPoint* California

---

6. The *NorthPoint* California Complaint was not attached to Verizon's motion to dismiss but was attached to plaintiffs' papers submitted in support of their motion to lift the PSLRA stay. It was obviously integrally related to plaintiffs' Complaint in this action and plaintiffs request this Court to take judicial notice of it. (Pls. Mem. Opp. Mot. Dismiss at 3.) Verizon does not argue otherwise and indeed relies on the *NorthPoint* California Complaint in support of its claims that plaintiff did not satisfy the pleading requirements of Rule 9(b) and the PSLRA. (Def. Reply Mem. Supp. Mot. Dismiss at 3–4 & n. 4.) But as stated above, even if we took judicial notice of it, no allegations asserted therein would call into question our decision today.

Complaint in connection with this motion, it merely alleges that by November 14, 2000 when Verizon filed its Form 10–Q, "NorthPoint [had] notified Verizon of its financial condition and results of operation" for the third quarter. (Harrison Aff., Ex. 1 (*NorthPoint* Cal. Complt. ¶ 32).) However, it is devoid of any specific allegation as to when and how Verizon learned of the revision of the third-quarter earnings. Although it does allege that representatives of NorthPoint and Verizon met on November 13, 2000, at which time Verizon falsely promised that it would proceed with the merger (*id.* ¶ 39), there is no explicit statement that the parties discussed the downward revision of NorthPoint's earnings at this time. These statements do not pass even the relaxed standard of pleadings set forth in *Wexner* because the relevant facts were not known only by Verizon, but were also known by NorthPoint.

The cases cited by plaintiff are factually distinguishable and thus not persuasive. In *Novak*, the complaint included facts supporting the allegation that the defendant knew that it had "serious inventory problems" but refused to mark down "worthless" inventory because of the possible financial damage that could occur. Indeed, the company sought to disguise its inventory problems by adopting a "box and hold" scheme which violated the company's markdown policy. *See* 216 F.3d at 311. These facts were sufficient to support the allegation that the defendants acted with scienter when they stated, *inter alia*, that the inventory was "in good shape" and that

"no major or unusual markdowns were anticipated." *Id.* at 304, 311–12. In *Cosmas v. Hassett*, 886 F.2d 8 (2d Cir.1989), "the defendants made or authorized statements that sales to China would be 'an important new source of revenue' when they knew or should have known that Chinese import restrictions in place at the time would severely limit such sales." *Novak*, 216 F.3d at 308 (quoting *Cosmas*, 886 F.2d at 12); *see Covance*, 2000 WL 1752848, at *10. Finally, in *In re Quintel Entm't, Inc. Sec. Litig.*, 72 F.Supp.2d 283 (S.D.N.Y.1999) (Conner, J.), we held that the complaint sufficiently alleged that the defendants knew that its disclosures were false and misleading because of various government investigations, public reports of increased chargebacks and notification from AT & T that it was scaling back its partnership with Quintel. *See id.* at 295. In contrast, the allegations that the statements regarding the merger status were made with the intent to deceive are merely conclusory and thus insufficient to state a claim under § 10(b). *See Shields*, 25 F.3d at 1129; *Elliott Assocs., L.P. v. Hayes*, 141 F.Supp.2d 344, 357 (S.D.N.Y.2000).[7]

### III. *Material Misrepresentation or Omission*

■ All of Verizon's challenged statements, including those in its Form 10–Q and even its approval of NorthPoint's press release concerning the status of the merger, are merely expressions of optimism concerning an uncertain future

---

**7.** We are aware that the *NorthPoint* California Complaint alleges that, *inter alia*, Verizon took "wrongful action to prevent the ultimate merger" when it notified the United States Department of Justice, Antitrust Division, and the United States Federal Trade Commission on or about November 30, 2000, that it was withdrawing the "Premerger Notification and Report" form filed with those departments on September, 19, 2000. (*NorthPoint* Cal.

Complt. ¶ 37.) However, this was not discussed in this Complaint or in the papers submitted in connection with this motion by either party. In any event, these actions occurred after Verizon terminated the merger. There are no other allegations in the Complaint which would support the claim that Verizon did not comply with these requirements.

event. A statement is material only if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor has having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). However, mere opinions and predictions of future performance are not actionable under the securities laws unless "they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *In re International Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir.1998) [hereinafter *"In re IBM"*]; *see also Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991).

For example, in *In re IBM*, various statements made by IBM that "its dividend was secure and that it had no plans to cut it," were held to be "predictions or opinions, and not guarantees" and therefore not actionable. 163 F.3d at 107. There was no evidence to support a conclusion that the speakers did not genuinely believe that the board of directors would maintain the dividend level in the future or that the speakers were aware of any facts undermining the reliability of such predictions. *See id.* at 109; *see also San Leandro*, 75 F.3d at 811. Analyzing the statements in their entirety, the court held that:

> [i]t would be unreasonable, as a matter of law, for an investor to rely on these projections as long-term guarantees because these statements contain sufficient cautionary language to indicate that they were only short-term predictions. As we have held, "[l]iability may not be imposed based on statements that, con-

sidered in their entirety, clearly 'bespeak caution.'"

*In re IBM*, 163 F.3d at 108 (quoting *San Leandro*, 75 F.3d at 811).

Similarly, in *Covance*, Judge Scheindlin held that the statements that the merger was "on track to close" in the fall of 1999, "could not possibly be understood as anything but opinions" because of "the usual level of uncertainty as to whether any proposed merger will actually be completed." 2000 WL 1752848, at *2, 9. Following two other lower court cases discussed below, she held that the statements "were neither accompanied by specific quantification or otherwise implied certainty" and were therefore not actionable unless plaintiffs could allege facts that would support an inference that the statements were known to be false when made. *Id.* at *10.

In *Kas v. First Union Corp.*, 857 F.Supp. 481 (E.D.Va.1994), defendants promised that they would use their "best efforts" to "permit consummation of the Merger at the earliest practicable date" in the first quarter of 1993. *Id.* at 484. On March 1, 1993, the merger was in fact consummated. *See id.* Although the merger did close within the first quarter, it did not close prior to February 26, 1993, the record date for payment of dividends to shareholders of the target company by the acquiring company. *See id.* Therefore, the plaintiffs claimed that the defendants did not use their "best efforts" to close at the earliest date, thereby depriving them of a first quarter dividend of $0.35 per share. *See id.* The court dismissed the amended complaint holding that "[b]ecause defendants' statements were no more than 'expressions of optimism' about the future consummation of the merger, they are not actionable under § 10(b) or Rule 10b–5." *Covance*, 2000 WL 1752848, at *9 (quoting *Kas*, 857 F.Supp. at 490). "[T]he securities laws 'do

not require that investors be treated like children ... [i]nvestors know that the stock market is a risky business, and that when a company's officers make predictions ... they are not issuing guarantees.'" *Covance,* 2000 WL 1752848, at *9 n. 12 (quoting *Kas,* 857 F.Supp. at 489); *Kowal v. MCI Communications Corp.,* Civ. A. No. 90–2862, 1992 WL 121378, at *7 (D.D.C. May 20, 1992), *aff'd,* 16 F.3d 1271 (D.C.Cir.1994).

In *In re Healthco Int'l, Inc. Sec. Litig.,* 777 F.Supp. 109 (D.Mass.1991), Healthco announced that it entered into a merger contingent upon its meeting a certain earnings target for the 1990 fiscal year. *Id.* at 112. On December 12, 1990, a spokesman for the company stated that "he was 'comfortable' that the deal would close before the late February deadline." *Id.* at 112, 115. On March 1, 1991, Healthco announced that it had terminated the merger because it could not satisfy the earnings requirement. *See id.* at 112. The court held that no facts were alleged that would indicate that the defendants "knew the planned merger would not or might not take place because of potential problems in meeting the [earnings] condition." *Covance,* 2000 WL 1752848, at *10 (quoting *In re Healthco Int'l,* 777 F.Supp. at 114). Indeed, it held that the statement by a director that he was comfortable that the deal would close "'is just the kind of optimistic, vague projection unaccompanied by any specific quantification or projected results implying certainty that falls short of qualifying as a material misrepresentation under Rule 10b–5.'" *Covance,* 2000 WL 1752848, at *10 (quoting *In re Healthco Int'l,* 777 F.Supp. at 115). As a matter of law, "[n]o reasonable investor would attach importance to such a statement in deciding to buy Healthco's stock at that time." *In re Healthco Int'l,* 777 F.Supp. at 115.

Plaintiffs' attempts to distinguish factually *Covance, Kas* and *In re Healthco Int'l* are not persuasive. The gravamen of plaintiffs' argument is that prior to the November 14 and November 20, 2000 statements Verizon knew that it would terminate the merger. Even assuming *arguendo* that Verizon knew about the revised-third quarter results prior to November 14, 2000 and that Verizon had a strong incentive to terminate the merger because of the negative analyst reports, there are absolutely no facts to support an inference that prior to November 29, 2000, Verizon did not expect the merger to proceed or believe any of its statements to be untrue.

None of the cases cited by plaintiff urges a different conclusion. For example, *In re Gulf Oil/Cities Serv. Tender Offer Litig.,* 725 F.Supp. 712 (S.D.N.Y.1989), the defendants had represented that they would use their "best efforts" to effectuate a merger. However, after a board meeting, it was alleged that the defendants had soured on the merger and tried to "goad" the Federal Trade Commission to sue to enjoin the merger so that it could terminate under the "litigation-out" provision of the agreement. *Id.* at 723. The court held that "[w]hen objectively verifiable factors cause a significant change in a party's attitude toward a merger—a 'sharp break from ... prior public positions,'—the securities laws may require that previously disclosed intentions be corrected." *Id.* at 748 (citations omitted).

Plaintiffs argue that objective factors such as the adverse market and analyst reactions to the announcement of the deal distinguish this case from *Covance* and supply the motive for a change of heart. However, the stock price decline and the adverse analyst reactions occurred in August 2000. That these factors did not cause a "sharp break" in Verizon's plans is

shown by its September 2000 funding of $150 million.

We are unsure why plaintiffs rely on *Ziemack v. Centel Corp.*, 856 F.Supp. 430 (N.D.Ill.1994). In that case, the spokesman for Centel, the target company, had stated that the bidding process was going "very smoothly." *Id.* at 435. By the time of that statement, investors were aware of PacTel's and Ameritech's limited interest in the project as well as GTE's withdrawal from the bidding process. *See id.* The court found that the statement could have been interpreted by an investor to mean that notwithstanding the actions of the three companies, there was significant interest from other investors to insure the smooth progression of the bidding process. *See id.* Because the complaint had also detailed the bidding process and the lukewarm interest, and in some cases lack of interest of other potential investors, the statement was found to be misleading. *See id.* at 436. *Ziemack* is clearly distinguishable from this case, because there the evidence established that the statement was contrary to facts known to the speaker.

Furthermore, we do not equate Verizon's statements with the description by a company to its own shareholders that it was a "thriving business," *see Freedman v. Value Health, Inc.*, 958 F.Supp. 745, 760–61 (D.Conn.1997) (conceding that the statement presented a close question as to whether the motion to dismiss should be granted), or whether there was a "pretty significant demand" for a certain product line and that shipment levels would increase in the third quarter of 1991. *See Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir.1996).

■ Finally, the complaint fails to satisfy the pleading requirements of Rule 9(b) and the PSLRA. "[T]o withstand a motion to dismiss plaintiffs must detail specific contemporaneous data or information known to the defendant that was inconsistent with the representation in question." *Covance*, 2000 WL 1752848, at *7 (discussing *San Leandro*, 75 F.3d at 812–13). "The mere disclosure of adverse information shortly after a positive statement does not support a finding that the prior statement was false at the time it was made." *Covance*, 2000 WL 1752848, at *7 (citing *San Leandro*, 75 F.3d at 812). Although plaintiffs argue that Rule 9(b) and 8(a) " 'must be read together,' " *In re Leslie Fay Cos. Sec. Litig.*, 918 F.Supp. 749, 760 (S.D.N.Y.1996) (Conner, J.) (quoting *Ouaknine v. MacFarlane*, 897 F.2d 75, 79 (2d Cir.1990)),[8] the basis of plaintiffs' Complaint is that Verizon had soured on the deal and merely used the revised third-quarter results as a pretext. However, there are no facts from which it could be inferred that Verizon had in fact decided to terminate the merger. Not only did they not allege when Verizon learned of the revision of earnings, they base their entire argument on market prices and analyst reactions in August 2000 and do not discuss the changes in Verizon's financial situation thereafter. This is not sufficient to satisfy the requisites of Rule 9(b) and the PSLRA.

Because we find that the statements made by Verizon were not actionable because they were mere predictions or statements of opinion, we do not reach the issue as to whether they were immaterial as a matter of law, i.e., whether a reasonable investor would have concluded that statements concerning the status of the merger

**8.** FED. R. CIV. P. 8(a) merely requires plaintiffs to plead a "short and plain statement of the claim showing that the pleader is entitled to relief."

affected the total mix of information available.

## IV. *The PSLRA Automatic Stay* [9]

■ This § 10(b) action was filed on March 2, 2001. In an attempt to support the claims asserted herein, on April 17, 2001, plaintiffs served a subpoena upon Folger Levin & Kahn LLP ("Folger Levin"), attorneys for NorthPoint in the *NorthPoint* California litigation, requesting the following documents: (1) "[a]ll documents that have been and will be produced by Verizon" in the *NorthPoint* California litigation; (2) "[a]ll transcripts of proceedings or deposition testimony that have been and will be taken in the *NorthPoint* [California] litigation"; (3) "[a]ny order of the Court or stipulations between Verizon and NorthPoint regarding the use of information or documents deemed confidential in the *NorthPoint* [California] Litigation." (Harrison Aff., Ex. 2 (alterations added).)

By letter dated April 20, 2001, Verizon's counsel responded to a letter sent by Folger Levin informing Verizon of the subpoena served upon it and inquiring as to whether there was a confidentiality order in place in this case. (*Id.*, Ex. 3.) Verizon informed Folger Levin that it had not entered into a confidentiality order with plaintiffs and advised them not to disclose any documents subject to the confidentiality order in the *NorthPoint* California litigation until it could reach a confidentiality agreement with plaintiffs. (*Id.*) Verizon also advised Folger Levin that it intended to file a motion to dismiss in this case which would result in a stay of discovery under the PSLRA. (*Id.*) On April 24, 2001, Folger Levin objected to plaintiffs' subpoena, stating, that: (1) "[d]iscovery ... is premature ... in light of the intention of defendant [Verizon] to file a motion to dismiss"; (2) "[v]irtually all (if not all) of the subpoened materials have been designated as 'Confidential' by [Verizon] pursuant to a Confidentiality Stipulation in the California action .... Thus, the subpoenaed party cannot produce the subpoenaed material without Verizon's consent or court order"; (3) "[t]he subpoena is burdensome in that plaintiffs can obtain the same material directly from Verizon"; and (4) "[t]he subpoena is overbroad and burdensome in that it purports to seek documents that have not yet been produced by Verizon in the [*NorthPoint*] California litigation

---

**9.** Plaintiffs waived their right to reply to Verizon's memorandum of law submitted in support of the instant motion. Instead, plaintiffs submitted a portion of NorthPoint's brief served in opposition to Verizon's motion to dismiss the fraud claim in the *NorthPoint* California litigation. The brief contains allegations that were not included in the *NorthPoint* California Complaint, such as the following:

> Within days of signing the Merger Agreement, Verizon prepared internal documents stating that it should encourage NorthPoint to spend millions of additional dollars on expanding its nationwide infrastructure, allow NorthPoint to deplete its cash resources, and then terminate the merger at a point in time when NorthPoint would no longer have cash available to avoid bankruptcy.

Although this portion of the memorandum assertedly contains "dynamite" as described by plaintiffs, it cannot be considered in connection with the PSLRA and the motion to dismiss. The memorandum was not incorporated by reference in the document nor was it integral to plaintiffs' claims. We also decline to take judicial notice of this memorandum as a public document. Plaintiffs have provided only the first few pages of the brief with no indication that it was verified. Moreover, although "courts routinely take judicial notice of documents filed in other courts," they do not do so to establish "the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Kramer,* 937 F.2d at 774.

and/or deposition transcripts from depositions which have not yet been taken." (*Id.*, Ex. 4.) As of June 6, 2001, three Verizon witnesses have been deposed and Verizon has produced over 45,000 pages of documents to NorthPoint. (Holozubiec Decl. ¶ 4.)

On May 17, 2001, Verizon filed its motion under Rules 12(b)(6) and 9(b). Pursuant to section 21D(b)(3)(B) of the PSLRA, discovery has been stayed in this case and plaintiffs have been precluded from obtaining documents from the *NorthPoint* California litigation to support their claims asserted in this Complaint. Plaintiffs seek to have the stay lifted in order to support the claims asserted herein. For the following reasons, plaintiffs' request is denied.

Section 21D(b)(3)(B) of the PSLRA provides that:

> [i]n any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

15 U.S.C. § 78u–4(b)(3)(B). Pursuant to this section, several courts have stayed discovery as soon as the defendant indicates his intent to file a motion a dismiss, rather than waiting for the actual filing in court. *See In re Carnegie Int'l Corp. Sec. Litig.*, 107 F.Supp.2d 676, 683 (D.Md.2000) (citing, *inter alia, Global Intellicom, Inc. v. Thomson Kenaghan & Co.*, No. 99 Civ. 342, 1999 WL 223158, at *1 (S.D.N.Y. Apr. 16, 1999)); *but see Novak v. Kasaks*, No. 96 Civ. 3073, 1996 WL 467534, at *1 (S.D.N.Y. Aug. 16, 1994).

Because plaintiffs have not alleged that the stay should be lifted to preserve evidence, the only issue before this court is whether particularized discovery is neces-

sary to prevent undue prejudice. *See also Mishkin v. Ageloff,* 220 B.R. 784, 792–93 (S.D.N.Y.1998) (holding that the plain meaning of the statute implies that the term "particularized discovery" modifies both the terms "preserve evidence" and "undue prejudice"). The Second Circuit has yet to define the term "undue prejudice." Elsewhere it has been construed to mean " 'improper or unfair treatment' " rising to a level somewhat "less than irreparable harm." *Vacold LLC v. Cerami,* No. 00 Civ. 4024, 2001 WL 167704, at *6 (S.D.N.Y. Feb. 16, 2001) (quoting *Medical Imaging Ctrs. of Am., Inc. v. Lichtenstein,* 917 F.Supp. 717, 720 (S.D.Cal.1996)). The sole example proffered by Congress as to what justifies lifting the stay is "the terminal illness of an important witness," which might "necessitate the deposition of the witness prior to ruling on the motion to dismiss." S. REP. No. 104–98, at 14 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679.

Essentially, plaintiffs seek to lift the stay for the sole purpose of uncovering facts to support the fraud allegations in the Complaint. Whether the sufficiency of the complaint should be determined prior to lifting the stay is an issue that has already been addressed by the Ninth Circuit in *SG Cowen Sec. Corp. v. United States Dist. Court for the N. Dist. of Cal.,* 189 F.3d 909 (9th Cir.1999). In that case, the district court granted the defendants' motion to dismiss because the plaintiffs had not provided any factual basis to support their § 10(b) claim, but granted plaintiffs leave to file an amended complaint. *See id.* at 911. In a subsequent motion, the court granted plaintiff's request for leave to take limited discovery to support their allegations. *See id.* The Ninth Circuit granted the defendants' petition for a writ of mandamus, holding that:

> The "Stay of Discovery" provision of the
> Act clearly contemplates that "discovery

should be permitted in securities class actions *only after the court has sustained the legal sufficiency of the complaint.*" S.Rep. No. 104–98, at 14 (1995), *reprinted in* U.S.C.C.A.N. 693 (emphasis added). The Act requires the trial court to dismiss the complaint if it fails to satisfy the Act's heightened pleading standards. *See* §. 78u–4(b)(3)(A). Thus, as a matter of law, failure to muster facts sufficient to meet the Act's pleading requirements cannot constitute the requisite "undue prejudice" to the plaintiff justifying a lift of discovery stay under § 78u–4(b)(3)(B). To so hold would contravene the purpose of the Act's heightened pleading standards.

*Id.* at 912–13 (emphasis in original); *see Medhekar v. United States Dist. Court for the N. Dist. of Cal.*, 99 F.3d 325, 328 (9th Cir.1996) ("Congress clearly intended that complaints. in these securities actions should stand or fall based on the actual knowledge of the plaintiffs rather than information produced by defendants after the action has been filed."); *see also In re Carnegie Int'l Corp.*, 107 F.Supp.2d at 679–81 (holding that the stay also precludes *defendants* from acquiring documents from a third party). We agree with the Ninth Circuit and conclude that the Complaint must stand or fall based on the allegations contained therein.

▆▆▆ Nevertheless, plaintiffs argue that their access to the documents sought would not thwart the underlying policies of the PSLRA because they are not seeking documents from defendants, but rather a third party to whom documents and relevant testimony have already been produced. They rely primarily on *In re Flir Sys., Inc. Sec. Litig.*, No. Civ. 00–360–HA, 2000 WL 33201904 (D.Or. Dec. 13, 2000). In that case, the district court permitted the plaintiffs to depose a former employee

of the defendant, Steven Palmquist, in an attempt to bolster their § 10(b) claim.

On a motion for reconsideration, the district court distinguished *Cowen* on three grounds. First, it observed that the discovery in *Cowen* was directed at the defendants whereas in *In re Flir Sys.* discovery was sought from a single third party, remarking that "the reasons for the PSLRA's stay of discovery are diminished when discovery is sought only from a single third party, not a defendant." *Id.* at *2. Second, the Court emphasized that the plaintiffs would not be engaging in a "fishing expedition," because Palmquist had already filed a civil complaint in state court that corroborated the plaintiff's allegations of fraud. *Id.* Finally, the only reason Palmquist did not produce the requested information was that the defendants had threatened him with legal action. The court held that:

> The PSLRA is a shield intended to protect security-fraud defendants from costly discovery requirements, *Cowen*, 189 F.3d at 911, not to be a sword with which defendants can destroy the plaintiffs' ability to obtain information form third parties who are otherwise willing to disclose it. Allowing defendants to seek dismissal of plaintiffs' complaint without affording plaintiffs the opportunity to discover Palmquist's information regarding defendants' fraud-information which is known to exist and which has been withheld only as a result of defendants' efforts to silence Palmquist-would result in "undue prejudice" to plaintiffs.

*Id.* at *3.

As a threshold matter, we note that the court in *In re Flir Sys.* conceded that at the time of "the court's [original] order, neither the parties nor the court were aware of the *Cowen* decision," *id.* at *1, which was decided more than one year prior to the original decision. This conces-

sion casts doubt on the court's decision; it is questionable whether it would have distinguished *Cowen* in the original opinion if it had been aware of *Cowen* at that time. In any event, *In re Flir Sys.* is distinguishable from this case.

Here, plaintiffs are not seeking documents belonging to a third party. The subpoena served on Folger Levin seeks documents which were produced by Verizon. Furthermore, the request for transcripts also includes testimony from three Verizon witnesses. Plaintiffs could have sought the relevant documents from Verizon, but instead choose to proceed through a third party, NorthPoint, in order to circumvent the statute. However, the PSLRA does not distinguish between discovery of non-parties and parties. *See In re Carnegie Int'l Corp.*, 107 F.Supp.2d at 679; *see Powers v. Eichen*, 961 F.Supp. 233, 235 (S.D.Cal.1997) ("By its language, the Reform Act addresses 'all discovery' with no distinction between that sought from nonparties as opposed to parties."). "It is well settled that when interpreting any statute, a court must first look to the plain meaning of the language, used by Congress." *In re Carnegie Int'l Corp.*, 107 F.Supp.2d at 679 (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)); *see Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176–78, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). Because the statute plainly and unambiguously provides for the stay of *"all* discovery," further judicial inquiry is unnecessary. *See In re Carnegie Int'l Corp.*, 107 F.Supp.2d at 679 (citing *Robinson*, 519 U.S. at 340, 117 S.Ct. 843). Additionally, in contrast to *In re Flir Sys.*, NorthPoint is not a third party who is "otherwise willing to disclose" the information. NorthPoint objected to the requested discovery in part because it was unduly burdensome in that plaintiffs could obtain the same information from Verizon. The information is also subject to a confidentiality order between Verizon and NorthPoint and cannot be disclosed unconditionally.

Moreover, plaintiffs have failed to satisfy the threshold burden of seeking "particularized discovery." They have requested all documents, testimony and transcripts that have been previously produced or will be produced in the future, amounting to more than 45,000 pages of documents. This is clearly not comparable to the request in *In re Flir Sys.* which involved only one deposition of a third party. Contrary to plaintiffs' allegations, the subpoena was not limited merely to discovery probative of the nature and timing of Verizon's decision to terminate the Merger Agreement. Instead, it appears to include: drafts of the Merger Agreement and documents relating to the term "material adverse effect"; documents relating to communications between Verizon and NorthPoint's investors, banks or investment bankers with respect to NorthPoint's financing; financial forecasts regarding Verizon and NorthPoint; and documents relating to NorthPoint's balance sheets, financial statements and income statements. (Holozubiec Decl. ¶ 5.) Although they might be relevant to the breach of contract claim in the *NorthPoint* California action, many of these documents are not relevant to the securities fraud claim here.

We find Judge Preska's decision in *Mishkin* persuasive in this regard. That case involved an appeal from the bankruptcy court's decision to grant the bankruptcy trustee relief from the PSLRA stay. The discovery request included all documents and testimony from the defendants, the defendants' customers and third parties. *See* 220 B.R. at 793. Judge Preska reversed the bankruptcy court's decision to lift the stay, holding in part that

the requested discovery was not "particularized." Specifically, she stated that:

[a]dmittedly, the concept of particularized discovery is a nebulous one, and the phrase is not devoid of ambiguity, but one thing is clear, if that requirement were satisfied based upon the degree of specificity urged by the Trustee, it would be rendered meaningless. The items of discovery sought by the Trustee encompass an open-ended, boundless universe of discovery. Far from particularized, it is basically a request to continue any and all discovery that may arise. Again, whatever the meaning of the phrase particularized discovery, and I need not decide its outer and inner confines herein, the Trustee has not satisfied it.

*Id.* at 793; *see In re Carnegie Int'l Corp.,* 107 F.Supp.2d at 684 (holding that request is not particularized where subpoena sought 21 categories of documents, testimony on 32 different subjects and every document relating to at least 77 separate individuals and entities). Similarly, the subpoena served in this case refers to all documents already produced or to be produced in the future.

Finally, plaintiffs argue that the requested discovery should be allowed because Verizon has already produced the documents to NorthPoint and therefore would not incur any discovery costs in connection therewith. The PSLRA was indeed enacted in an attempt "to redress certain perceived abuses in securities class actions, including 'the abuse of the discovery process to coerce settlement.'" *Vacold,* 2001 WL 167704, at *6 (quoting *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 530–31 (3d Cir.1999)); *see Cowen,* 189 F.3d at 911 ("This section was 'intended to prevent unnecessary imposition of discovery costs on defendants.'") (quoting H.R. Conf. Rep. No. 104–369, at 32, *reprinted in*

1995 U.S.C.C.A.N. 730); *see* S. Rep. No. 104–98, at 14 ("discovery costs account for roughly 80% of total litigation costs in securities fraud cases") (citations omitted). Therefore, those courts who have decided to lift the stay have done so in part because the limited discovery request would not impose additional discovery costs on the defendants.

However, this case presents unique facts as plaintiffs could have sought the documents from Verizon. Instead, it opted to proceed through NorthPoint and request its attorneys to compile the information or provide reasons as to why such documents could not be produced. NorthPoint has already objected to the subpoena because it is unduly burdensome. It would be unfair to require NorthPoint, a non-party to this action, to expend its time and money while Verizon stands idly by. Therefore, if we decided to lift the stay, we would require the party to this action, Verizon, to produce the requested information.

Our decision should not be interpreted to mean that defendants may use the stay as a shield to insulate themselves from liability. Indeed, if the absence of discovery would essentially protect defendants from liability, undue prejudice would result. *See Vacold,* 2001 WL 167704, at *6; *Global Intellicom,* 1999 WL 223158, at *2; *Medical Imaging Ctrs. of Am.,* 917 F.Supp. at 721 n. 3. For example, in *Vacold,* the plaintiffs claimed that the defendants advised the plaintiffs that no pharmaceutical companies were interested in investing in the company, Applied Vaccine Technologies Corp. ("AVT"), which was formed to develop virtual lymph node technology, thereby inducing plaintiffs to sell their shares in AVT. Contrary to those assertions, Johnson & Johnson and its subsidiary (collectively "J & J") had provided approximately $3 million in financing. *See*

2001 WL 167704, at *3. Judge Schwartz lifted the PSLRA stay in order to allow limited discovery on the issue of "the nature and timing of J & J's interest and investment." *Id.* at *7. At oral argument, the defendants declined to disclose the timing of its commercial dealings with J & J. Because of the lack of candor, the court held that the plaintiffs would in fact suffer undue prejudice. *See id.* at *5, 7. Furthermore, the court concluded that narrowly limited discovery would not coerce a settlement or support a claim not alleged in the complaint. *See id.* at *7.

*Vacold* is distinguishable from this case. We do not agree with plaintiffs that refusing to grant limited discovery would shield defendants from liability and result in undue prejudice against plaintiffs. Plaintiffs could have waited to determine what allegations were proven in the *NorthPoint* California litigation rather than filing first and using the action to discover whether they have a viable securities fraud claim. History has proven that "[p]laintiffs sometimes file lawsuits in order to conduct discovery in the hopes of finding a sustainable claim not alleged in the complaint." *Id.* at *6 (quoting S. Rep. No. 104–98, at 14). The PSLRA was therefore designed to deter the "abusive practices committed in private securities litigation" which includes "the routine filing of lawsuits . . . with only faint hope that the discovery process might lead eventually to some plausible cause of action." 141 Cong. Rec. H13699 (daily ed. Nov. 28, 1995) (statement of House managers); *see also* S. Rep. No. 104–98, at *14 (testimony before the Senate from corporate executives included the following statement: "once the suit is filed, the plaintiff's law firm proceeds to search through all of the company's documents and take endless depositions for the slightest positive comment which they can claim induced the plaintiff to invest and any shred of evidence that the company knew a downturn was coming" (citations omitted)). We do not agree with plaintiffs' assessment that the filing of the motion to dismiss was a devious tactic, but see it as an example of proper lawyering. Our granting of the motion makes it obvious that we do not find it to be frivolous. Accordingly, plaintiffs' motion to lift the stay is denied.

### CONCLUSION

For the above stated reasons, Verizon's motion to dismiss the Complaint is granted and plaintiffs' motion to lift the PSLRA stay is denied. By letter of July 25, 2001 to the Court, plaintiffs sought leave to amend the Complaint in specified respects. They are hereby granted leave to do so within 20 days of the date hereof, provided they can supply the missing allegations within the constraints of Rule 11, FED. R. CIV. P. By letter of July 26, 2001, Verizon sought permission to move to dismiss the Amended Complaint. Verizon is hereby granted leave to move to dismiss the Amended Complaint and for a stay of this action pending determination of that motion.

**SO ORDERED.**